[PHILADELPHIA, APRIL 19th, 1837.]

The SCHUYLKILL NAVIGATION CO. *against* MOORE.

2wh477
.182 525
2 W 477
202 70
2wh 477
·226 111

The plaintiffs, an incorporated company, authorised to use the water of the river Schuyl-kill for navigation, and to grant out the water power for manufacturing purposes, conveyed to the defendant a certain lot of ground, &c. "together with the privilege of drawing from the canal, through the forebay or tunnel, from time to time and at all times hereafter, so much water as can pass through two metallic apertures, one of 50 square inches and the other of 250 square inches, respectively, under a head of three feet, to be measured from the middle of each of the said apertures respectively to the face of the water of the said canal, &c.: To have and hold the said described lot, &c. and the right of drawing from the said canal the quantity of 300 square inches of water in manner aforesaid, under a three feet head:" Yielding and paying a certain annual rent per inch of water. The defendant applied to the aperture a certain conical tube, called an *ajutage*, by which the flow of water was enlarged. It appeared that this invention was known to persons conversant with hydraulics, and to some of the officers of the Navigation Company before the making of the contract. *Held* that the true construc-tion of the contract was, that the water was to be delivered in the ordinary way, and that the defendant had no right to increase the flow by means of an ajutage.

THE president, managers and company of the Schuylkill Navi-gation Company brought an action on the case in this court against John Moore, to recover damages for drawing a greater quantity of water from their canal than, it was alleged by them, he was enti-tled to under his grant.

The plaintiffs were incorporated by the act of 8th March 1815, with authority to use the water of the river Schuylkill for the pur-poses of navigation, and to grant out the water power for manu-facturing purposes. Under this authority numerous grants were made.

By indenture of bargain and sale, dated the 1st of February 1830, between the Schuylkill Navigation Company and John Moore, reciting that a certain Mark Richards had agreed with the com-pany on the 3d of November 1827, for the purchase of a lot of ground thereinafter described at forty dollars per acre, and on the 25th of January 1828, for the purchase of 100 inches of water power at Flat-rock canal at the annual rent of six dollars per inch, to commence that day and payable half-yearly; and on the 13th of March 1828, for the purchase of the further quantity of 200 inches of water power at Flat-rock canal at six dollars per inch; the rent of 100 inches to commence 1st of March 1829, and 100 inches 1st of June 1829; which water power was agreed to be granted to the

said Mark Richards on the usual conditions and subject to the former grants of water power: And reciting further that the said Mark Richards and wife, on the 4th of January 1830, granted to the said John Moore the lot and the aforesaid water power of 300 inches of water, to be drawn from the Flat-rock canal for the use of mills or any mill work except for making gun-powder or for sawing timber logs or lumber, together with the appurtenances: And that the said Mark Richards did therein desire and request the Schuylkill Navigation Company to make the conveyance and grant of the said lot and water power on the terms and conditions of their sale to him—the whole rent 1840 dollars per annum being paid up to the 1st of December 1829: The plaintiffs then conveyed the lot; describing it by courses and distances, &c. proceeding as follows :—" Together with the right and privilege of keeping the passage now cut from the said canal within the said lines of the above described lot continued to the said canal through the western bank of said canal, which bank is 20 feet wide and is intended to be left open and used as a towing path and road along the western bank of the said canal; and of the rail-way now made through the land of the said company from the said passage so cut as aforesaid to the said public road, and thence across the said public road as far as lies in the power of the said company as the owners of the soil of the said road to grant the right of keeping the said raceway across the said road to the above described lot of ground; and of placing in the passage or opening so cut as aforesaid by him within the said limits, a forebay or tunnel of good and substantial construction, whereby the water may be drawn from the said canal to the above described lot of ground for the use of mills or any other water works now erected, or hereafter to be erected on the said lot, except for making gun-powder or for sawing any timber logs or lumber, which are hereby absolutely prohibited; which forebay or tunnel shall have sliding gates placed therein so that the whole water may be, as occasion requires, entirely stopped from entering into it, and the same shall be so arched over or covered as to prevent it impeding in any degree the said road or towing path: And together with the privilege of drawing from the said canal through the said forebay or tunnel from time to time and at all times hereafter forever, so much water as can pass through two metallic apertures, one of fifty square inches and the other of 250 square inches respectively, under a head of three feet to be measured from the middle of each of the said apertures, respectively to the face of the water of the said canal opposite to the above described lot of ground, when the same is as near as may be on a level with the late top before the same was recently changed and raised, of the present great dam erected by the said company across the said river at the head of the said canal, together with the privilege of building a bridge across the said canal," &c.

(The Schuylkill Navigation Co. v. Moore.)

" To have and to hold the said described lot of ground, hereditaments and premises, and the right of drawing from the said canal the quantity of 300 square inches of water in manner aforesaid under a three feet head, with the appurtenances and privileges hereinbefore and and hereinafter mentioned, under and subject to all the restrictions and limitations in these presents mentioned and contained." Yielding and paying the said rent, &c. The deed contained a covenant by Moore to pay the taxes and the rent—erect and support and maintain the forebay and tunnel and keep in repair the side banks of the canal—not to encumber the road—and to erect at his own expense and forever support in good order the two metallic apertures, one of 50 square inches and the other of 250 square inches, through which the said 300 inches of water under three feet head were to pass—and to prevent all leakages, &c.: and it was provided that it should be lawful for the grantors and their agents to enter on the premises for the purpose of examining the fixtures and the placing of such metallic apertures and ascertaining their size and whether any leaks existed in the premises which might occasion more water to be drawn from the said canal than was thereby granted; and if they found any such defects or leaks, or on due notice the same were not forthwith removed and remedied, it should be lawful to shut down the sliding gates until such defects and leaks should be removed and remedied without any abatement of rent. Or it should be lawful for the company to make repairs at their expense and distrain for the same as rent. The grantee covenanted to open the gate during heavy rains to prevent overflowing; that he would not manufacture gun-powder, or saw timber under a forfeiture of the premises and stoppage of water and re-entry. In case of any break of the dam, the company was to repair within 30 days, or the rent should be suspended, but no other damage. If the water of the dam in the opinion of the company should be insufficient to furnish the quantity necessary for navigation and to answer their sales, they retained the right to enter on the premises, and withhold the 200 inches of water from passing through the metallic aperture of 250 square inches so long and until the water which might be furnished by the great dam, should in the opinion of the company be sufficient to answer the purposes of the navigation.

Previously to this conveyance to the defendant, Mark Richards the grantee, had made certain alterations in or additions to the aperture hereafter described, which increased the flow of water into the forebay: and in a bond taken by him from the defendant, it was stipulated that any action which might be brought against him by the Schuylkill Navigation Company, should be defended by Richards; and if it should be decided that the defendant had no

right to draw the water in the manner then practised, the obligation should become void, &c.

On the trial before GIBSON, C. J., at a Court of *Nisi Prius*, held in Philadelphia, the plaintiffs after reading the deed to the defendant, introduced the following testimony :

Frederick Erdman. " We were directed to examine the mills by the company. This memorandum was made by Mr. Gill, from minutes he made on the ground ; I don't recollect the date ; we were directed, and made the observations at the time when the mills would best permit ; we examined the mills from one end to the other, not exactly in regular rotation, but as might suit the mills ; at the north mill was a rectangular aperture longer than it was high ; I don't recollect the dimensions ; I have no memorandum of the square one, more than the report made at the time. As to the other mill—the south one has what they called a conical tube ; the aperture was circular ; it opened into the forebay ; the conical tube was inserted into the forebay ; the funnel part was all in the forebay ; it projected some distance inside, and the tube some distance outside ; the length of the tube was about eight feet ; I should suppose about one-eighth of it inside the forebay, and about seven-eighths outside ; I don't know that that dimension was correctly taken ; it is merely from memory. I was present at the experiments that were made on the 6th of November, 1830, on the flow of water through an aperture and through a tube ; something like that exhibited ; several persons were present ; I was requested by Mr. Jos. S. Lewis to prepare an iron plate to suit the smallest diameter of the conical tube, which, on measurement, I found to be seven and twenty-five-one hundredth inches ; likewise a rectangular plate of twenty-five inches long and two inches high ; both of which plates were inserted into the forebay that the conical tube was inserted in. As regards the time, I think this was done the day before the experiment was made, on the 6th ; the water was drawn through the conical tube, I think first ; if my memory serves me right, there was a nail placed exactly one foot below the surface of the water ; the forebay was then filled, and the gate drawn, to permit the water to pass through the conical tube ; the water was exhausted ; drawn down to the nail ; that is, one foot, in one minute and twenty-eight seconds ; the forebay was filled again, and the water let through the plain circular plate ; the time occupied in drawing down the same distance, was four minutes and eighteen seconds ; the forebay was filled again, and drawn through the rectangular aperture of twenty-five inches long and two inches high ; the time occupied in drawing it the same distance as the other experiments, was two minutes and forty-six seconds ; the aperture at the north mill, I think was metallic in all its parts. *Cross-examined*—I am not regularly in the employ of the company ;

(The Schuylkill Navigation Co. v. Moore.)

I have been employed occasionally in some part of their works, and was, at that time, employed to take their measurement; I think we gave notice to Dr. Moore; we called there, and made the measurement, in rotation with the rest of the mills; I don't know that they had any prior notice—not from me; I don't recollect that any was given; I don't recollect exactly the thickness of the iron plate—may be a quarter of an inch; not measured, I believe, as to thickness; I did not take the thickness of the rectangular plate; the thickness of the circular plate was about a quarter of an inch; I did not measure it; as near as I can recollect from the view of it; I made no note of it; I did not observe the *vena contracta*, when the water came through the circular plate; I did not look for it; my attention was occupied in watching the time by a stop-watch, and the nail; the experiments were tried once at each opening at each aperture; my attention was always drawn to the stop-watch and the nail; the subject was then new to me; I had never seen any such experiments before; I have not read exactly of experiments of that kind; but I have of drawing water though a conical tube; I don't recollect the author; it was a work treating of hydraulics; an elementary work; I think it is quite likely I saw it in Gregory; I am not positive; it was seven or eight years ago probably; I never read any of the experiments of Venturi; I never saw any of them put in practice; I never worked at Wilson's mill on the canal; I have been there and seen the forebay; it is a square rectangular opening; the first mill on Manayunk canal; the passage on each side is rectangular above and below the aperture; the last time I saw it was at the time we took the measurement; that was the only time I recollect of; I think the smallest part of the conical tube was at the place of its passing through the plank into the forebay; that was seven and twenty-five one hundredth inches, as near as we could measure the diameter; that gives a little rising forty-one square inches; it was the same size as the circular plate."

Edward H. Gill. " I was present at the measurement of the different apertures; the measurement was in March, 1831, I believe; I can't give the opening at Dr. Moore's mill, where it is rectangular; this is the measurement; north mill, nine feet six and a half by three inches; the aperture, that is three hundred and forty-three and a half square inches; the south mill is a circular aperture of seven and a quarter inches in diameter, equal to forty-one and twenty-eight and a quarter one hundredths square inches; carried out here to a great many places of decimals; there was a conical tube at that mill; this is the form of it; the dimensions were given by Mr. Erdman to me; it was not measured while I was there, except on the smallest part; these are the dimensions given me by Mr. Erdman; we examined, I believe, all the other mills at Manayunk; in the other mills, the water was generally passed through a rectangular opening; we examined Smick & Gorgas's; Lea, Newman &

Co.'s; Moses Hey's; William Rowland's; Samuel Eckstein's, (paper mill); Charles V. Hagner's; Thomas B. Darragh's; Andrew Adams's; Joseph Ripka's; Thomas M'Dowell's; John Keating's; John Rush's; T. & S. Wagner's; I was occasionally in the service of the Schuylkill Navigation Company at that time; I am now in their service as an engineer; generally retained for the company." *Cross-examined.* "I believe I made out and served no notice on defendant; served no written notice; I was not present at the experiments; we had the water drawn off to examine the rectangular opening; we requested it to be done; I saw the water drawn through the opening; I did not measure the size of the water coming through; I don't recollect whether I measured the opening myself; Mr. Erdman and one of his men, and myself, were there; I don't know who measured; it was measured with calipers; Mr. Erdman furnished them; we took the size with the calipers, and applied it to a rule; I don't recollect the size of the calipers; they might extend a foot; may be not so much; we had not to apply them more than once, I believe; I can't tell the head of the water at that time in the forebay, nor the state of the water in the river; I have no recollection of remarking that the aperture was larger than it ought to be." *Re-examined.* "I did not know at that time what the aperture ought to be; I think I did when I made my report; I will not be confident; I was employed merely to measure and ascertain how much the apertures were below the level of the water-line in the canal; what head there was; I put in marks above the apertures at this mill, so that it might be measured down from these marks to the water; we drove nails in the lintels over the apertures, and then measured up from the apertures to those nails; the nail was not driven where the water ought to be, but a memorandum made of the measurement from the nail of the distance; then when the water was let in from the forebay, measuring from the nails to the surface of the water, and deducting that from former measurement, was the head of water on the aperture; I don't recollect whether the water was then above the proper line; it always has been running over the waste weir; when I made a measurement, we only used the calipers to take the height; not the length; we measured the length generally with a rule; the aperture was very long; we had two pieces of wood prepared for the purpose, and passed them; placing them on one another, and marked on both where each came to; my remark of applying the calipers but once, was intended to apply exclusively to the circular opening of seven and a quarter inches; the circular aperture I saw measured; the measurement of fourteen and twenty-five one hundredth inches, was taken by Mr. Erdman prior to that time; we took but one diameter of the circular aperture; I calculated the number of inches in the rectangular opening; I believe it came out

exactly three hundred and forty-three and a half, without any fraction; I never studied hydraulics or hydrostatics."

Mr. Erdman, being recalled, said : " I measured the pipe, and gave them accurately to Mr. Gill; I believed them to be so; as accurate as I could give them ; the calipers were mine; they were said to be steel; about from eight to ten inches would be the extent of them; we had a two-foot rule; an engineering rule."

Thomas Gilpin. " I have been thirty years conversant with water-power, chiefly at Brandywine, but I have also been acquainted with many of the mills and water-powers in this district and in Maryland; I have seen the mills in the eastern states; in 1828, I passed through the eastern states, with a view of seeing the different water powers; and the manner in which water was applied and delivered at many of the mills in New England; I have had several mills in Maryland and on the Brandywine; they are within three or four miles of Wilmington; twenty-five mills on the Brandywine; in all cases that I have been acquainted with or examined, the water has flowed to the water-wheel through rectangular openings, which have been made larger or smaller, to afford the necessary quantity of water; I know what a pitch-back wheel is; I have seen them frequently; the water is delivered through the same description of aperture; wherever it is desirable to have a water-wheel larger or smaller than the water-wheel which is to be supplied, the wheel must be a pitch-back, because the water goes on the back of the wheel; it is not on the front; it is loading the wheel, the advantage of being delivered so as to revolve against the current; I never saw a tube-wheel; very little acquainted with them; water is used to very little advantage in tube-mills; I never thought them worth attending to." *Cross-examined.* " The water passes into the natural channel again at Brandywine; all the channel is used for a mile; the water-power at one mill has three feet water more than we can use; the mill above us never pools water on us; I am not acquainted with the water at the falls of Passaick at all; I do not know of any general custom or manner as to delivering water by the inch; I know nothing of it; I have known the theory of the delivery of water, three or four—within ten years; my knowledge was derived principally from books; I never made any experiments myself; I don't recollect what work; I am not acquainted with the theory of the contracted vein at all."

James P. Espy. " I did experiment in a small way several years; 5 or 6 years ago; I mean beginning then; the last were in the fall of 1830, in a large way, connected with the Franklin Institute; was a member of the committee, but have not the notes; the last experiments were made after the patent, on the patent tube; a great variety of experiments were made; Mr. Richards paid the expense

(The Schuylkill Navigation Co. *v.* Moore.)

of this patent; I am not certain how Mr. Young was connected with Mr. Richards; I was at one experiment at the mill; I think not a rolling mill; a spinning mill I think; Mr. Young made the hole in the forebay; I was induced to believe that Mr. Venturi had come very near the best mode of delivering the greatest quantity of water, and I wanted to verify his experiments; Mr. Richards had the right of using the patent on his own mill; I had other views besides verifying Venturi's experiments; I wished to try other fluids besides water, at least mercury; which I did, and found a very nearly similar result; also to ascertain whether this increased discharge was connected in any way with the atmospheric pressure. I was unable to satisfy myself on that point with my own small experiments, and I entered more freely into those of the Franklin Institute, which had a height of 50 feet. I never thought of capillary attraction, but I did of the attraction of cohesion; I thought the atmosphere had something to do with, and the air getting in, certainly reduces the velocity. Mr. Richards told me the company would not permit him to use a hole higher than three feet below the forebay; he wanted to use it a foot higher up; all other things being equal, the higher up, the greater the force; it occurred to me, that if the same quantity could be taken at the height of one foot, and carried and delivered at the wheel, two feet higher, it would increase the power, and in that way I considered it as a new invention, and I was entitled to a patent; it would increase it in the way of delivering it higher up; it would enable us to pass a great deal more under a head of one foot, than without this adjutage; three times I believe as much as six; but without my notes I cannot tell exactly. Suppose the head and fall. Take a head of one foot; just half as much will flow out as four; I found the increase was not as much under a head of one as three; under three, it gave as much as a twenty-five feet head or flow; the head of one foot; it goes on increasing to about three feet and a half or four feet, at which is the maximum effect of the tube; under that will flow as much as flows under a simple atmosphere of thirty feet plus the heighth of three and a half or four feet; it ceases to have the great effect after a considerable extent; above three and a half feet you have the thirty-three feet of the atmosphere; you have very near fifty-three feet."
*Cross-examined*; " I meant the pressure of the atmosphere on the reservoir, and the removal of it at the end of the tube; we had some tubes quite too wide, and into these we thrust a stick and it resisted the effect; the atmosphere presses at the rate of fifteen pounds the square inch; the more you flare the tube until it reaches such a width that it ceases to flow, it increased the quantity; the patent tube gave within a fraction of three times the mere opening; a head of three feet amounted to as much as twenty-seven plus three; extending the tube beyond the opening and widening it, increases the quantity; the first time my attention was ever particularly

turned to the contracted vein, was about 1817; Dr. Patterson said the reason of the increased flow from Venturi's tubes was not known; I heard him lecture on the subject in 1816 or 1817; he lectured both on the contracted vein and adjutages; the former he explained; referred to Venturi's lectures at the university; I imagined that I was the first that ever invented making the water come to the wheel *higher up;* I did not think I was the inventor of increasing the flow of water through conical tubes, as I think the patent will show; I had been long acquainted with Venturi's adjutages, and imagined every body else was that had any knowledge on the subject; I read the work in various periodicals, and among the rest, the Edinburgh Encyclopedia; Dr. Robertson says expressly the cause is not understood; if there is the smallest particle of air gets in near the contracted vein, it destroys the flow; Venturi does say it is connected in some way with the atmosphere, that is, the inner discharge. Mr. R. never has availed himself of any sales under this patent that I know of. The tubes were fastened together with joints, and it was extremely difficult to avoid the air; the material was tin and some copper; sometimes fastened them with tallow, and afterwards soldered."

On the part of the defendant, the following testimony was given:

Walter R. Johnson. " The aperture is eight hundred and sixty-one one-thousandths of an inch; the water at the distance of one quarter of an inch is seven hundred and forty-two one-thousandths; I have made experiments on a smaller scale, and have satisfactorily convinced myself that there is that contraction of the vein; it is stated by Newton, that the proportion is about sixty-six one hundredths between the vein and the orifice; the theoretical calculation being one hundred, the actual discharge is sixty-two; the contraction is thirty-eighty one hundredths, the difference; I made experiments on the flow of water, through *apertures* and *adjutages;* I think in the winter of 1829–30; the law of adjutages varies with their form. If we apply an adjutage externally to the vessel, that which is expanded outwards will occasion the greatest flow; something depends upon the length too; the relation between the length and the diameter is given in the books; I think nine to four is given by Bossuet, two-tenths at the smallest opening internally; the smallest diameter is the one I refer to; the length is nine-fourths of the smaller diameter; I think the highest result I could obtain with an apparatus not perfect; I obtained a result of one, eighty-seven hundredths to one; these experiments were made by opening two openings in a circular vessel, (we call a plain aperture that which has technically speaking, no adjutage,) and another made at the same horizontal level, to which the adjutages more than one were applied; the mode of making the experiment was to apply two vessels at the same instant, and withdraw them at the same instant, and measure the

quantity which has flowed into each vessel; I think that Venturi states that the cylindrical adjutage of the same size with the plain aperture, gives an increase; that apertures flaring outwards, makes it more than double what theory would have given to the plain aperture; my adjutage was in all cases horizontal, but I conceive that immaterial; I think it would make no difference that the adjutage was inclined downwards; it would take off no more of the pressure of the atmosphere; the water moves more slowly when it comes out of a bell-mouthed adjutage; I believe there was an investigation by the committee on water power of the Franklin Institute on water wheels; I was not on that committee; the experiments on adjutages were as I understand subsequent; I did not see the experiments; an extensive series of experiments was made on adjutages; S. V. Merrick was chairman of that committee appointed to institute a series of experiments to ascertain the value of water power; Mr. Espy, Reeves, Professor Bache, was added to the committee afterwards; I never compared their results with my own. I can't give the date of the experiments; I think it was 1831; not certain; it occupied considerable time; I was led to suppose they lasted several weeks; if made of the form of the *vena contracta*, and of the length, the funnel or cap would make no difference in the discharge of water; both theory and experiment give that result."

Richard Rambo. "I am a mill-wright by trade; I have done mill-wrighting at Manayunk a good deal, at one time or other; first was in 1823, I guess; before Manayunk was built, I repaired, altered Captain Power's. It was from a grant of this canal pitch back wheel; I always considered that there was an advantage in making the penstock in that shape; it lets down the water more together; it is a little like Towers' and more like Jerome Keating's which we commenced in 1825, and finished in 1826; both of them are inclined in the same; all are that I built; I built one for Mr. Brooks; I believe it was in 1824; it was funnel-shaped too; pretty much like this; I made one for Mr. Darrach; his was more like an overshot; not so much funnel-shape; it has some; I made his, I guess, about 1825 or 6. I have made what we call tube wheels; there is an upright shaft put in it to drive back saw carriages; only used for saw-mills or some like affair; made one on Chester creek, a good many years ago; 1827 before; water is delivered on a shoot or funnel; it is tight; it is taken out of the forebay or wherever it may suit; twelve one way, 15 the other; the largest end is where it receives the water, and the smallest where it delivers it out at the wheel; mostly make them tapering; I don't know whether it was any great advantage; it was the form used any how, for tube wheels; used as long as I can remember; I was three or four years ago, four and better, at Manayunk; the water was too low sometimes; I had nothing to do with it; when we were building, working at Mr. Keating's, Mr. Keating called me out to look at the canal; I did look at it, and it

was down." *Cross-examined.*—" I believe Mr. Towers held the water under the Navigation Company; I understood so; these tube wheels are sometimes used for grinding corn; for flour mills it used to be; I examined Mr. Mark Richards's mill in 1826; I went to see whether the apertures were of the right size where the water was let on; all the apertures I examined there, were made by straight lines; I can't recollect whether metallic on every side or not; I reported to the company as it was at the time, according to the fact, whether metallic or not, as it was, as near as I could; I fixed some of the apertures myself; I examined all; those that were fixed by others; some were not ready; Gorgas' had not theirs on, and I reported it as it was, those that had and had not; I know Mr. Young; have seen him frequently; he used to be engaged at Mark Richards's factory; I don't know whether he is now or not; water had sunk in the canal; boats going through, had drawn it down below the usual height; rolling mill, was I think about building when I went away; spring of 1829; I can't tell whether it was built or not; they were talking about building it any how. The day I spoke of was owing to the number of boats going through; Keating's opening is at right lines; square at the ends, as well as at the top and bottom."

Lewis Oust. " I am employed by the watering committee of Philadelphia; employed since commencement of iron pipes; we have laid funnel-mouthed pipes at the reservoir; the first main that was laid, about 14 years ago. Mr. Joseph S. Lewis, (President of the Schuylkill Navigation Company,) was chairman of the watering committee at that time. The funnel-mouth was 22 inches at the small end, which was the size of the pipe; the other 30 inches, which was in the reservoir; it was done so that the water would give a full supply; if it was all of one size, there would be a vacany; it has been in use ever since; when the branches-off are made from the main pipe in the streets, wherein they are made, they are funnel-mouthed, and twice as large as the main; so as to receive a full body of water; there is one at every street in the city where the iron pipes are laid; I should suppose the difference in the quantity of water is about one-eighth." *Cross-examined.* " These pipes were laid under the direction of F. Graff; the hole of the muzzle was inside the reservoir; the hole of the large part; the same as you put a funnel in a bottle; it swells more sideways than up and down; it also swells up and down; some of the branches are small and won't admit of enlarging up and down, and are flat; they are made more large in the width on that account."

Walter R. Johnson being re-called, stated the results of experiments made on the preceding day. " The first experiment was that on the adjutages. The water in the forebay was drawn down from

one mark to the other; two marks being placed in the forebay to mark the beginning and end of the experiment; in the first experiment, it was drawn from one to the other, in fifty-six seconds with the adjutages. By the second experiment, in fifty-three seconds. In this experiment there was a little defect in the descent of the water, as it was waving, &c. The third experiment was made in fifty-five and three-quarter seconds. The second series of experiments was with the circular orifice, which I found to be seven and twenty-five-one-hundredth inches in diameter. In the first experiment, the time was one hundred and thirty-four and three-quarter seconds. This aperture or orifice I presume to be placed at the same level with that in the adjutage. I was apprehensive that it (the flow) was arrested too soon, but I don't know that I could have varied it one second. The second experiment was made in one hundred and thirty-eight and three-quarter seconds; and the third was made in one hundred and forty and one-half seconds. The third series was to ascertain the effect of the contracted vein. The contracted vein was five and seven-eighth inches in diameter to the size of the orifice, which was seven and one-quarter inches. The area of the contracted vein will be twenty-seven and one hundred and eighty-eight-one-thousandth square inches; the area of the orifice itself is forty-one and two hundred and eighty-two-thousandth square inches. I calculated the proportions between the areas—the one is sixty-five per cent. of the other. Newton I thought before, was sixty-six; but it is the square root; we tried it several times by the calipers. The fourth series was on a rectangular opening twenty-five and one-tenth in length, by two inches in breadth. The largest was horizontal; same level as the circular orifice. I found by the first experiment, it gave one hundred and six and one-half seconds the flow; the second experiment gave one hundred and five and three-quarter seconds the flow. I made a comparison between the quantity that flowed in these two last experiments, taking their mean time of one hundred and six and three hundred and thirty-six one-thousandth seconds. I compared them with the time found by the first series, with the adjutages actually employed at the mill. The mean of them being fifty-four and eleven-twelfth seconds. I called it fifty-five, and compared it with the time of the rectangular opening, and found that the quantity flowing through the adjutage in a given time was one and nine thousand three hundred and thirty-four ten-thousandths. I compared the smallest of the experiments, and found it showing that it is about double through the adjutage than through the rectangular opening; the rectangular opening contains five and two-tenth square inches. The rectangular opening plain like this will give a greater quantity of water than the circular opening. The flow of liquids is not as the heights, but as the square root of the heights. The rectangular being placed vertically, would give a different result. We can't compare well two together of different

form.    The stream was smaller out of the rectangular opening than the orifice itself."

Besides this parol testimony, the plaintiffs gave in evidence 23 deeds, most of which bore date previously to the grant to the defendant, containing clauses similar to that in the defendant's deed; and they alleged that the *ajutages* had not been used at any of the other mills, at Manayunk.    The defendant also gave in evidence a letter addressed to Mr. J. S. Lewis, as Chairman of the Watering Committee of Philadelphia, dated in the year 1819, in which the effects of the funnel-mouth were stated and discussed.    He also exhibited various works on hydraulics and hydronamics, showing that the mode of drawing water complained of, had been known and taught for many years.

The learned judge who tried the cause, reserved for the court in bank, the construction of the terms of the grant; but he charged the jury that the turning point of the cause before them was, whether the preceding purchasers of similar privileges had omitted to use the adjutages, because it suited their convenience to receive the water without them, in which case it would have little or no effect; or whether these other purchasers took the water in the way they did, because they considered that to be the true meaning of the contract.    In the latter case, he instructed the jury that the defendant would be bound by this practical construction, and the verdict ought to be against him.

The jury having found a verdict for the plaintiff, the defendant moved for a new trial, and filed the following reasons :

1. " Because the privilege of drawing water is limited only by the size of the aperture and the head of water; and the true construction of the deed authorized the use of the adjutages. '

2. Because the power of procuring a supply of water by means of adjutages, was an extrinsic circumstance, which entered into and formed part of the contract.

3. Because the acts of the other purchasers of water privileges at Manayunk, could not affect the rights or vary the contract of the defendant.

4. Because the jury should have been instructed that if the state of the improvement in the mechanic arts was such as to render the delivery of water as practised by the defendant, a matter of ascertained principle, the exercise of that knowledge was lawful and proper.

5. Because there was no concealment, fraud or misrepresentation, on the part of the defendant.

6. Because at the time of executing the grant, the manner of

receiving the water contemplated by the defendant, was known to the plaintiffs, and no restriction was introduced into the deed.

7. Because the attention of the jury was drawn to a wrong point, when it was especially called to the exercise of the privileges granted by the plaintiffs to the owners of mills at Manayunk.

8. Because there was no evidence of usage in favour of the construction of the terms of the grant, as the jury has construed them by their verdict.

9. Because the verdict is against the weight of the evidence.

10. Because the learned judge erred, in not telling the jury that upon the face of the deed, the defendant had a right to draw the water in the way he did. The jury in their consideration of the extrinsic circumstances had a right to be informed, and to know that according to the legal construction of the deed *per se*, the defendant had a right to draw the water in the way he claimed to draw it.

11. Because the verdict is for the plaintiff when it should have been for the defendant."

Mr. *Meredith* and Mr. *J. R. Ingersoll*, in support of the rule, contended, that by the true construction of the contract between the parties, the defendant was entitled to 300 square inches of water outside of the aperture; that, as in consequence of the *vena contracta* he did not obtain that amount, he had a right to make use of such an opening as would secure a sufficient flow of water; and that as it appeared by the correspondence and other evidence produced at the trial, that the use of *ajutages* was well known, especially to the officers of the Schuylkill Navigation Company, before the contract was made, it was to be supposed that this method of drawing the water entered into the intention and contract of the parties. Several works on hydraulics and hydronamics were cited, to show the general understanding of the subject: and on the legal operation and effect of the instrument were cited, *Jordan* v. *Meredith*, (3 *Yeates*, 318.)   *Newbold* v. *Wright*, (4 *Rawle*, 212.)   *Stoever* v. *Whitman*, (6 *Binn.* 417.)   *Rapp* v. *Palmer*, (3 *Watts*, 179.)   2 *Bos. & Pul.* 168; *Douglas*, 277; 7 *Term Rep.* 214; 2 *Bl. Com.* 379; *Wych.* 93; 4 *Maule & Selw.* 426; 11 *East*, 643; 4 *East*, 135; 7 *Johns. Rep.* 390; 2 *Hovenden*, 238; 1 *Merivale*, 502; 2 *Powell on Contracts*, 144; 1 *Bro. P. C.* 415; 1 *Atkyns*, 10; 8 *Viner*, 510, pl. 14; *Noy's Maxims*, 91; *Plowden*, 156; 3 *Chitty Com. Law*, 115, 116; *Wood's Conveyances*, tit. *Grants*, p. 677; 2 *Rolle's Abr.* 56; 1 *Powell on Contracts*, 237, 241; *Sheppard's Touchstone*, 100; 2 *Wheaton*, 195; *Sugden on Vendors*, 38; 3 *Barn. & Cres.* 623.

Mr. *W. B. Reed* and Mr. *Sergeant*, for the plaintiffs, argued, that the intention of the parties was that the defendant should receive a certain quantity of water through a rectangular aperture at its ordinary flow, and without any artificial draught—that as it appeared

from the books of science, (which were produced and commented upon) that the *vena contracta* was known at least as early as the time of Sir Isaac Newton, the parties were to be supposed to have entered into the agreement with the knowledge that an aperture of 300 square inches would not deliver at the point of contraction more than 200 ; and that the understanding of the community in relation to it was shown by the 23 deeds given in evidence from the company to other individuals, in which no *ajutage* was used.   On the question of the construction of the contract they cited, *Willes,* 332 ; *Hob.* 277 ; *Plowden,* 140, 290 ; 6 *East,* 290 ; *Hardr.* 294 ; 2 *Brod. & Bingh.* 46 ; 4 *Cruise Dig.* 291 ; 10 *Mass. Rep.* 461 ; 4 *Mass. Rep.* 205 ; 2 *Comyn on Contracts,* 535 ; 2 *Blackst. Comm.* 380 ; *Plowden,* 134 ; *Wood's Conveyances, (Powel's Ed.)* note p. 335; 8 *Mass. Rep.* 172 ; 1 *Serg. & Rawle,* 380 ; *Sheppard's Touchstone,* 88.

The opinion of the court was delivered by

GIBSON, C. J.—The best construction is that which is made by viewing the subject of the contract, as the mass of mankind would view it ; for it may be safely assumed that such was the aspect in which the parties themselves viewed it.   A result thus obtained, is exactly what is obtained from the cardinal rule of intention; of which many instances might be adduced.   By it, a tenant is restrained from changing the nature of the thing demised, even to the enhancement of its value.   Equity has enjoined him from converting a corn-mill into a fulling-mill, and a meadow into an orchard, and from making other alterations entirely consistent with the letter of the contract ; because it was supposable, from the ordinary course of things, that the property would be used for the purposes to which it was adapted.   In *Bonnet* v. *Sadler,* (14 *Ves.* 526,) the lessee was prevented from turning a mansion into a coach-maker's shop ; and in *Douglass* v. *Wiggins,* (1 *Johns. Ch.* 435,) from turning a private house into a store.   It is true that in the first of these, the lease had been procured by representing that the house would be occupied as a dwelling ; and in the second, that improvements were to be made conformably to the wishes of the lessor ; but where the parties are silent, the presumption that the thing is to be applied to its accustomed use, is as powerful as an explicit representation.   By any other standard of interpretation than the course of things, a parlour might be turned into a barber's shop, and its character depreciated without any change of its construction.   A recurrence to ordinary habits and uses for a meaning which has been obscurely expressed, is as frequent in respect to other transactions, as those quoted ; and how stands the construction of the contract, as it is affected by it, in the case before us ?   In hydraulics, the effect of an adjutage was known ; and it is said that the grantor was consequently bound to guard against the use of it, if it were meant to be precluded.   The

proof is, however, that it was known almost exclusively to men of science. But actual knowledge of it was brought home to certain members of the company: Still a corporation is not to be affected with the private information of individuals among those who compose it. Even actual knowledge would be no criterion. In the cases quoted, the lessor knew that a mansion might be turned into a work-shop; yet he was not required to know that the lessee would attempt it, and to guard against it by a prohibitory clause. As to the argument on the words of the grant, that every thing '*can* pass,' which can be *made* to pass, it is enough to say that the word relied upon, however emphatically enunciated, expresses no more than is signified by 'will' or 'may;' and that an unassisted effusion could not have been more aptly defined. A grantee may make as much profit of the thing, as it has capacity to produce; but he may make it, so far as the grantee is concerned, only by an application of it to its ordinary uses promoted by the ordinary means. May he not however avail himself of discoveries to make it more valuable in his hands? He may doubtless avail himself of any thing which, in its results, works no alteration in the substance of the contract. An artificer employed at stipulated wages, may use subsequently invented machinery, though the effect of it be to make his wages inordinately high, because the ratio of compensation for which his employer bargained, is not disturbed by it; but he may not avail himself of means not in ordinary and familiar use at the time, to the prejudice of another. For instance, a purchaser of coals at the pit's mouth, for so much the cart load, might not introduce a rail-road to increase the burthen—at least he would be bound to pay in proportion to the increase. The application of improvements to alter the relative advantages of the contracts would be a perversion of it. Now the proofs were clear that an adjutage had never been used to transmit water from a penstock to a wheel. The patentee of the invention testified that the application of it to that use, was exactly what he claimed as an original invention; and his patent is posterior to the contract. Indeed it is impossible to imagine a reason why it should have been used. The end to be gained by it, can be more cheaply gained by simply enlarging the aperture than by applying an apparatus to it. It is of convincing importance that the improvement, so to speak, can benefit the owner of it only by being applied to gain a surreptitious advantage from a contract which would not have been made had the purpose subsequently attempted to be accomplished by it, been suspected. In expounding a statute, as in expounding a contract, recourse is had to the qualities and condition of the thing to be affected, as it existed in popular contemplation. Thus it was ruled in the *United States* v. *Tenbrook*, (2 *Wheat.* 248,) that rectified spirits were not dutiable as a product of distillation, because rectification, though strictly a process of secondary distillation by which alcohol is produced in its highest state of

concentration, is not distillation in the sense to which Congress had regard. A convergent principle of that case, is that the defendant might not lawfully have produced pure alcohol by a continued process of distillation in the first instance, and have paid duties on it in proportion to its volume when contracted—else he might have gained an advantage not intended from the increase of its volume in reducing it again to the standard of market proof. What else is insisted on here, but a right to pay in proportion to the volume of the stream only at the point of its greatest contraction, instead of the point of its escape. It is of no consequence that by a contrivance unheard of before, the point of contraction and the point of escape, were brought together. The defendant alleges that he purchased, not the efflux of an aperture, but a vein of specific dimensions; and that he has not his quantity if it be of less dimension than the prescribed diameter in any part of its course. What would be said of a pretension, on the other side, to measure the quantity by the diameter of the column after it had passed the point of contraction and gained its utmost expansion? The defendant would think it very unreasonable; but it is not more so than what he claims by his own interpretation. The plaintiff however claims only for the average diameter guaged, in the terms of the contract, by a metallic aperture of given dimensions; and that its product, without regard to subsequent expansion or contraction, be taken for the thing granted. The defendant contends that such was, in fact, the aperture used, being the shortest diameter of a tube placed in the perforation of the penstock. Its place however is immaterial, as it would have delivered the same quantity had it been placed elsewhere. To measure the quantity by an aperture of increased power, however placed, would be inconsistent with the spirit of the contract. But the apparatus used was inconsistent not only with its spirit, but its letter; for an aperture, in common parlance, is one thing, and an aperture with a tube in it, is another. Beside, an aperture equal in space to a given number of square inches, must be rectilinear; for till the quadrature of the circle be discovered, the diameter of a circle equal in content to a given square, will not be found. The hydraulic inch, is a circle whose diameter is an inch; and the recurrence to the square inch, for purposes of specification in the contract, seems to indicate the shape of the aperture. But the question is to be determined, not by principles of science, but by common experience directed to the discovery of intention. The plaintiff purchased, and the defendant sold, a given power deliverable in the ordinary way; and on the ground of legal construction reserved at the trial, to say nothing of the fact found, the recovery was clearly proper.

Rule discharged.