Iszard v. Mays Landing Water-Power Co.

---

ABRAHAM L. ISZARD

*v.*

THE MAYS LANDING WATER-POWER COMPANY and others.

1. Under a grant of the use of water for a certain purpose, with a prohibition against certain other uses specified, the grantee may use it for any purpose not prohibited.

2. Under the circumstances,—*Held*, the grantor in such a case had no right to entirely cut off the supply of water from the grantee on an alleged violation of his covenant regulating its use.

3. Damages for loss of the use or custom of a mill previous to filing the bill, are recoverable at law, and cannot be allowed in a suit for the specific performance of the contract to supply water to such mill.

---

Bill for specific performance. On final hearing on pleadings and proofs.

*Mr. William E. Potter*, for complainant.

*Mr. Peter L. Voorhees*, for defendants.

THE CHANCELLOR.

By an act of the legislature approved March 4th, 1846 (*P. L. 1845 p. 51*), Jeremiah Stull was authorized to construct a dam across the Great Egg Harbor river at May's Landing, in the county of Atlantic, for the purpose of creating a water-power for the benefit of such mill or mills or other water-works for manufacturing or other purposes as should be thereafter erected by him, his heirs or assigns, or any other person or persons or bodies corporate to whom he or they might thereafter let, sell or lease any water-power, right or privilege; and he and they were empowered to use the power for such purposes forever thereafter. He subsequently, under the power conferred by the act, constructed the dam. He was then the owner in fee of certain land there adjacent to the land of the complainant, and lying between the complainant's land and Stull's dam and pond. After the construction of the dam and the creation of the water-power by means thereof, Stull, on the 14th of April, 1847, executed and delivered to the complainant a deed whereby it was, among other things, recited that the complainant had purchased of him a water-power right or privilege in the dam, with certain conditions and reservations thereinafter named and particularly set forth, for the purpose of driving the fan of a cupola furnace; and Stull thereby, for himself, his heirs, executors, administrators and assigns, in consideration of the annual payment of $60 thereby agreed to be paid by the complainant, granted to the latter, his heirs and assigns, a certain water-power right or privilege, under the act of the legislature, as follows: Two hundred and seventy-five square inches of water to be taken from the fore-bay of the grist-mill of Stull, which was supplied with water by means of the dam, together with the privilege of digging and cutting a trench across Stull's land, and of placing in the ground beneath the surface there, a trunk to carry the water from the fore-bay of the grist-mill to and upon the land of the complainant, where the cupola furnace was to be built; and in case the two

hundred and seventy-five square inches of water should be insufficient to drive the fan of the cupola furnace, the complainant was, if he should put up a well-constructed water-wheel for the furnace, to have an additional supply from the fore-bay of the grist-mill sufficient to drive the fan by means of the trunk, without any additional payment, and he was to have the privilege of, at any time, repairing the trunk or putting in a new one across the lands of Stull to his land. And Stull thereby agreed to have and keep a sufficiency of water, at all times, in the fore-bay of the grist-mill to supply the complainant, his heirs and assigns, with the two hundred and seventy-five square inches of water; and, in case that should not be sufficient to drive the fan of the cupola furnace, such additional amount as would be sufficient for the purpose. And the complainant thereby covenanted that he would put in a well-constructed water-wheel for the cupola furnace, and that he, his heirs, executors, administrators and assigns, should not and would not use any of the water for the purpose of driving a grist or merchant-mill, or an oakum-mill or factory for the manufacture of oakum.

The parties bound themselves, each to the other, in the penal sum of $10,000 for the true performance of all and every of the covenants and agreements contained in the deed. The deed was acknowledged on the day of its date as a deed of conveyance of real estate, according to the statute, and was recorded on the same day in the clerk's office of the county of Atlantic. Immediately after the execution of the instrument, the complainant, pursuant to the terms thereof, dug a trench across the land of Stull, and put a trunk therein, for the purpose of conveying water from the mill-dam to his lands, and constructed a fore-bay, and put in a water-wheel there. The trunk was originally made of the dimensions of two feet by four feet, and was four hundred and sixty-two feet long from the fore-bay of Stull's mill to the complainant's fore-bay, immediately over his water-wheel. The latter fore-bay was built three feet five inches in width by thirteen feet in length in the clear.

and a water-wheel of the kind known as Dripp's all-pressure water-wheel, was put in place there. The trunk and forebay were constructed and the wheel put in place under the direction of an experienced and skillful millwright, and an aperture was carefully cut by him as a test of the amount of water flowing over the wheel when in full operation, by which it was shown that the amount of water used was two hundred and seventy-five square inches, and no more. During the construction of these works, Stull was frequently present and inspected and examined them, with a view to ascertaining whether they conformed to the agreement, and he appears to have been satisfied with them. After they were completed, the complainant used the water conveyed through the trunk (and paid the consideration according to the agreement) so long as Stull continued to be the owner of the dam and water-power, with Stull's consent, and without any objection on his part, and continued to use the water by means of his works up to the 5th of September, 1872, when it was entirely cut off by the defendants.

From the year 1861 to 1870, the complainant ceased to operate his furnace, but paid the $60 a year to the owners or possessors of the mill-seat and power, according to the terms of the agreement. About the 1st of May, 1870, he took down and removed the cupola of his furnace, and constructed a saw-mill there, to be driven by the same water-power which he had previously used in driving the fan. Immediately before he started the saw-mill he relined and repaired the trunk, at an expense of about $1,000. No objection was, at any time, made by the owners of the Stull property to his use of the power for the saw-mill until about the time when the water was cut off, as before-mentioned, in 1872. The power was so used for the saw-mill, without objection, for about two years.

On the 5th of September, 1872, the defendants (the defendant company had, previously thereto, and in 1867, become the owner of the Stull property) effectually cut off,

on the premises of the defendant company, the water from the complainant, and subsequently, by means of a solid stone wall, permanently prevented the water from running into the complainant's trunk, and ever since have deprived him of the use of it. Up to the time when the water was cut off, the complainant paid the $60 a year, according to the agreement. By his bill, he prays that the company may be decreed specifically to perform the agreement, and to re-admit the flow of water from its fore-bay and mill-seat into his trunk, according to the true intent and meaning of the agreement, and to pay him the damages he has sustained by its cutting off the water.

The defendants, by their answer, insist that the only right granted to the complainant was the right to use the water to drive the fan of the cupola furnace, and that he could not lawfully apply the power to any other purpose; that the measure of the grant was two hundred and seventy-five square inches of water, and no more, that amount being sufficient to drive the water-wheel and fan of the cupola furnace when in operation; and they allege that the company has at all times claimed, and has repeatedly notified him before he built his saw-mill, as well as afterwards, that he had no right to use the water under the agreement for any other purpose than for driving the fan, and that he had no right to use the water to drive a saw-mill, and that any attempt to use it for the latter purpose would be resisted and contested by the company. They allege that he used far more than two hundred and seventy-five square inches of water, and as much as four hundred and fourteen, for his mill, and that he also drew from his trunk or fore-bay water for domestic and other purposes, for himself and others, and that his trunk and fore-bay were decayed and leaky, and wasted water. They also allege that, having complained to him without effect, of his unlawful use of the water, they informed him, by letter dated August 29th, 1872, that they had ordered his supply to be cut off until the amount of water used by him should be reduced to two hundred and

seventy-five square inches, and until the use of the water for domestic purposes by him and others should cease, and his flume be repaired; and that having so notified him, and he not having complied with their request to cease from the unlawful use of the water, they cut it off.

The case presents the following questions: First, whether the complainant, under the agreement, is entitled to the use of the water for any other purpose than to drive the fan of a cupola furnace; second, whether, if he was at liberty to use it for the saw-mill, the company was, under the circumstances, justified in cutting it off; and, third, whether he is entitled to an assessment of damages in this suit for the breach of the agreement.

As to the first question:   Under a grant of the privilege of sufficient water to propel certain specified machinery, the grantee is entitled to the use of the water for any purpose not requiring a greater power than is reserved. *Ang. on Watercourses* § *149a* ; *Luttrell's Case, 4 Coke 86*.

In *Ashley* v. *Pease, 18 Pick. 268*, cited by the defendants' counsel as an authority to the contrary, the grant was of so much water as might be necessary to carry on and supply the fulling-mill then standing, or which might thereafter stand, upon the lot granted.  The court held that it was manifest, from the general tenor of the contract, that it was the intention of the parties that the grant should be limited to the use of the water for driving the fulling-mill, and that the use of it for a carding-machine was unauthorized.

The best judicial construction of such a grant as that under consideration, is, it was said by Chief-Justice Gibson in *Schuylkill Nav. Co.* v. *Moore, 2 Whart. 477*, that which is made by viewing the subject as the mass of mankind would view it, for it may be safely assumed that such was the aspect in which the parties themselves viewed it, and the result thus obtained is exactly what is obtained from the cardinal rule of intention.

While in the present case the grant was of water for the purpose of driving the fan of a cupola furnace, there is

nothing in the agreement to indicate that it was the intention of the parties to confine the use of the water to that particular purpose.   On the other hand, there is evidence to the contrary in the covenant on the part of the complainant not to use it for driving a grist or merchant-mill or an oakum-mill or factory for the manufacture of oakum.   Such particularity of exclusion would, of course, have been unnecessary if it had been intended by the parties to confine the use of the water to the driving of the fan of the cupola furnace.

The complainant, and those who claim under him, are entitled to use the water for any purpose except that against which he has particularly covenanted.   He and they cannot lawfully use it for the purpose of driving a grist-mill, or a mill for the manufacture of flour for sale (called a merchant-mill in the agreement), or an oakum-mill or a factory for the manufacture of oakum, but for any other mill or purpose he and they may use the water on condition of paying the annual sum specified in the agreement.

The defendants, although they knew of the building of the complainant's saw-mill and the purposes for which it was designed and of his intention to drive it by means of the water under the Stull grant (and it appears that almost a year was occupied in building it), do not appear to have made any objection to such use of the water by him until the fall of 1872.   And the mill was driven for more than two years by that water, to the knowledge of the defendants, before the water was cut off, and the company annually received the compensation for such use of the water under the agreement.   Indeed, it appears that the mill was driven by the water for two years before any question was suggested as to the complainant's right to use the water for the purpose.   There clearly was acquiescence in his construction of the agreement.

It appears, by the letters put in evidence on the part of the defendants, written by the treasurer of the company to the complainant in the summer of 1872, that while the com-

pany then questioned his right to apply the water to the purposes of a saw-mill, they even then did not deny it.   Mr. Wood, by whom the letters referred to were written, testifies to a conversation which he had with the complainant in the spring of 1872, before the water was cut off, which was in the fall of that year.   He says that, in that conversation, the complainant claimed that he did not take more than the two hundred and seventy-five square inches of water, but that if he did do so he had a right to do it.   He says that this is the only conversation that he remembers to have had with him ; that he began the conversation by telling the complainant that he thought that he was taking more water than he was entitled to, and he adds that the conversation was with reference to the amount of water, and that nothing was said about the use of the water for domestic purposes; that he (Wood) was not aware of the fact of its being so taken at that time.   It will be seen that, in this conversation, the right of the complainant to use the water for the mill was not even questioned.   George Wood, the president of the company, testifies that in 1876, four years after the cutting off of the water, he told the complainant that the company would want some kind of settlement as to what his rights were under the lease, but would prefer, if possible, upon ascertaining his rights, to terminate the grant entirely by a compensation to him.

In a letter dated July 29th, 1872, written by Edward R. Wood, the treasurer of the company, he says that he understood from what the complainant said to him, referring to a previous conversation, that the complainant considered that he was entitled to something more than that which appeared to be the strict construction of Stull's grant; and he adds: "Supposing your claim to be correct, it becomes important for the water-power company to understand what the amount of it is.   Perhaps the first and simplest step would be for me to come down some afternoon when you can let the saw-mill stop for an hour or two, so that we can have time to inspect, together, your flume and the opening through

Iszard *v.* Mays Landing Water-Power Co.

which it discharges." It will be perceived that the only
real question suggested by that letter is as to the amount of
water which the complainant was entitled to use. In a let-
ter written by the same person, in the same capacity, dated
August 5th, 1872, he says: "I fear I did not express my
meaning clearly, if you understood me to make a positive
statement about the matter either way. All I want is to
get at all the facts in the case, and then have our respective
rights set down so clearly that, when we are dead and gone,
our children may have no doubt or misunderstanding about
it. I hope to be down next week, and, if you are not at
home, will avail myself of your permission to inspect the
outflow of your flume." In a letter written by him on the
29th of the same month, he says: "Availing myself of
your permission, I yesterday inspected your water-wheel
and found that the orifice through which the water passes
to the wheel measures two feet in height and four feet in
breadth, making eleven hundred and fifty-two square inches.
I also learned that you drew water out of the flume for
household purposes and supplied other persons in the same
way. I also noticed that your flume leaks in several places,
both on our property and your own. The directors of the
Mays Landing Water-Power Company consider these points
of so much importance that they are compelled to notify
you that they have ordered your water supply to be cut off
until you shall have them rectified. This is without any
reference to the other question, whether or not your case
allows of your using the water for any other purpose than
to blow the fan of the cupola furnace. Please take notice
that the water will be cut off from your flume until the
orifice is reduced to two hundred and seventy-five square
inches and until the domestic supply be broken off and the
flume repaired." In none of these letters, as before
remarked, is the complainant's right to use the water for
the saw-mill denied.

As to the second question: It appears from the evidence
that, as before stated, very soon, if not immediately, after

34

the grant was made (which was in 1849), the provision for conveying the water from Stull's premises to the place on those of the complainant where it was to be used, was made not only with care and under skillful direction and supervision, but also practically under the inspection of Stull himself, and that he was satisfied that that provision was in conformity with the grant both as to the quantity of water and otherwise. The same provision remained and was in use from 1849 until the breaking out of the war of the rebellion, in 1861, a period of about twelve years. In 1870 the complainant repaired and relined the flume. From 1849 to the spring of 1872 he appears to have claimed the right to use, and to have used for fourteen years of the time, or thereabouts, the water to the same extent as provided for originally and that, too, without question or objection on the part of Stull or any of those who claimed under him.

In *Society for Establishing Useful Manufactures* v. *Holsman, 1 Hal. Ch. 126*, the complainants had sold a lot, in 1813, in the city of Paterson, with the right of taking from their canal twelve inches square of water. A mill was shortly afterwards erected on the lot and water was drawn from the canal for supplying it, without the use of any means for accurately measuring the quantity drawn. In 1827, fourteen years after the grant was made, the complainants gave notice to the owner of the mill that they had reason to believe that he was taking more than the stipulated quantity of water, and requested him to confine his future use of water within the terms of the grant. He replied that he was not using more than the foot of water. Again, in December, 1843, the complainants gave a like notice to him and made a like request, but he did nothing to limit the flow. In 1844 the complainants built a stone wall in their canal, opposite the head-race leading the water on the lot, and placed in the side of the wall a piece of cast-iron with an aperture in it of twelve inches square for the flow of water into the head-race, and thereupon the owner of the mill prostrated the wall. This court denied a motion for a

preliminary injunction restraining the owner from taking more water than would run through an aperture of twelve inches square, or from pulling down or taking out any gauge which the society might insert for the purpose of measuring twelve inches square of water. The chancellor (Halsted) appears, by the opinion, to have denied the complainants' application for a preliminary injunction upon the ground that the condition of affairs complained of had existed for thirty years, and that it had continued for eighteen years or thereabouts after the complainants made objection to it by notice, and he appears to have been inclined to the opinion that, though the quantity used should turn out to be more than that which was stipulated for by the grant, yet that the defendant was entitled to it from long user.

In the present case there is an important circumstance already adverted to once or twice, that the provision for taking the water was made under the inspection of the grantor himself, and that it has continued unchanged ever since. It appears from the evidence that, after the trunk was relined in 1870, the amount of leakage was very small. When the complainant began to run the saw-mill, in May, 1870, he found that the trunk leaked, and he thereupon stopped the mill to repair the trunk, and relined it at an expense of about $1,000. Among other witnesses, Russell D. Green, the superintendent of the company, testifies that after the trunk had been relined it did not, he thinks, leak, except in one place, the corner of the grist-mill. George Wood, the president, speaks of the leaks, referring to each of them in particular, and it appears from his testimony that they were of comparatively little importance. And it appears that in a conversation which Edward R. Wood had with the complainant in the spring of 1872, before the water was cut off, no mention was made of the leaks, but only of the quantity of water which the complainant claimed the right to use. In this connection, reference may be appropriately made to the use of water for domestic purposes, mentioned in one of the letters.

Iszard *v.* Mays Landing Water-Power Co.

This use of the water, by the complainant and others, appears to have been by virtue of a verbal license from Stull himself, which was never revoked, as far as appears by the testimony, until the letter of August 29th, 1872, which, it may be stated, was not received by the complainant until after the water was cut off. In that letter the writer says (referring to the day, before the date of the letter, on which he had inspected the water-wheel &c., by permission of the complainant) he had learned, apparently for the first time, that the complainant drew water out of the flume for household purposes, and supplied other persons in the same way. But if it be conceded that the evidence shows that the complainant was using, at the time when the water was cut off, more water than he was lawfully entitled to, the action of the company in cutting off the water, and depriving him entirely of the use of it, was unjustifiable. It had a remedy, by action at law for the recovery of damages, for any injury which had been inflicted upon it by his unlawful use of the water. It does not appear that it was subjected to any inconvenience, even, by reason of such alleged excessive use. According to the letters, an adjustment of the rights of the parties under the grant was all that the company was seeking. There was, therefore, no necessity for cutting off the water to protect itself. When the complainant went to the company's premises to remove the obstruction which it had placed there to the flow of the water into his trunk, the company resisted him by, at least, a show of force, and compelled him to retire. It subsequently proceeded to build a stone wall, which effectually and permanently prevented the flow of the water into the trunk. Its action deprived him of the motive power for his mill, and rendered that property almost, if not wholly, worthless. The object of the company appears to have been, to a certain degree, at least, judging from the evidence, to extinguish his lawful right, and not to protect itself against his unlawful use of the water. Although four years elapsed, from the time when the water was cut off, before the bill in

this cause was filed, that delay, long as it is, does not disentitle the complainant to relief.

The existence of the grant is not denied. That it is binding upon the company, provided the complainant is, under it, entitled to use the water for a saw-mill, is not questioned. By the answer, the company says that, ever since it became seized and possessed of the water-power and property, it has been at all times, and still is, ready and willing to keep the agreement, according to the true intent and meaning thereof, and at all times to furnish to the complainant the two hundred and seventy-five square inches of water for the purpose of driving a fan to a cupola furnace.

The complainant is entitled to a decree requiring the company to restore to him the privilege of the grant. It should be required to remove the obstruction from the flow of the water into the trunk as it was accustomed to flow at the time when it cut off the water.

The complainant claims, by his bill, and his counsel insisted upon the hearing, that he is entitled to receive at the hands of this court, by a decree in this suit, damages for the breach of the agreement. As before stated, for four years before this suit was brought, his mill stood idle for want of the water-power. It entirely lost its custom, its machinery greatly depreciated, and part of it became almost, if not entirely, worthless. The building deteriorated from want of use, and the complainant's stock of logs, which was there at the mill to be sawed when the water was cut off, remains there still. Though this court has, in a suit for specific performance, jurisdiction to award compensation for any deficiency in the title, quantity, quality, description or other matters touching the estate, it has not jurisdiction to award damages for the breach of a contract, except as ancillary to a specific performance or to some other relief. *Story's Eq. Jur.* § 799; *Wiswall* v. *McGowan, Hoffm. Ch.* 125; *Gilb. For. Rom.* 214.

In *Corporation of Hythe* v. *East, L. R. (1 Eq.) 620,* the court said that, before Sir Hugh Cairns's act, the court had no power to give damages.

In *Copper* v. *Wells, Sax. 10,* it was held that where specific performance of an agreement has become impossible, or, from the nature of the contract, cannot be decreed, the party aggrieved is entitled to compensation in damages for the non-performance of the agreement (and see, also, *Lounsbery* v. *Locander, 10 C. E. Gr. 554, 559*), but that there is a distinction between damages arising from the non-performance of the contract, which damages may be partly imaginary and partly the result of actual or supposed loss or inconvenience, and the damages to which the party is justly entitled for repairs or beneficial or lasting improvements, made on the faith of an engagement afterwards discovered to be defective or impossible to be executed by a default of the opposite party; and that in the first case the damages can be properly assessed only by a jury, upon an issue of *quantum damnificatus;* in the last, the compensation may be safely ascertained by an inquiry before a master or a commissioner, or, at the discretion of the court, an issue may be awarded.

In *Berry* v. *Van Winkle, 1 Gr. Ch. 269,* that [case was followed, and compensation was decreed for valuable and permanent improvements placed on leased premises, while damages for alleged infringements on the lessee's rights during the term were denied. Referring to the case of *Copper* v. *Wells,* the court says, that while that case establishes a rule by which compensation may be obtained in this court for permanent improvements placed on leased premises, it by no means sanctions the whole relief sought in the case then under consideration, and the chancellor (Pennington) added that he was not disposed to go further, and he, therefore, as to the damages for the alleged infringements on the lessee's rights during the term, left the parties to their legal remedy.

There will be no decree for damages in this case.