## Gibson *against* Tyson.

*B.* by deed conveyed to *F.* a tract of land in fee simple, "excepting and reserving for himself, his heirs,, executors, administrators, and assigns *all mineral or magnesia of any kind*, and to convey the same away through the premises intended to be sold, so as to do as little damage to the owner as possible, with all bricks and blocks of soapstone, as I the said B. may want for my own use." Held, that this was such a reservation as entitled the grantor to *chromate of iron*, afterwards found.

WRIT of error to the district court of *Lancaster* county.

This is an action of replevin, in which the plaintiff, Isaac Tyson, jr., claims 35 tons of chromate of iron as having been taken from him by William Gibson the defendant.

The latter pleaded that this chrome was his own property, which the plaintiff denied; and upon that fact the issue between them depended.

In 1820, David Brown purchased at sheriff's sale a tract of land in Little Britain township, containing 130 acres more or less, with a small stone house and small stable thereon, for the sum of 425 dollars.

On the 3d of April 1830, he agreed in consideration of the sum of 500 dollars, to sell and convey this tract of land to Vincent Field, his heirs and assigns, "excepting and reserving for himself, his heirs, executors, administrators and assigns, *all mineral or magnesia of any kind*, and to convey the same away through the premises intended to be sold, so as to do as little damage to the holder as possible, with all bricks and blocks of soapstone as I, the said Brown, may want for my own use."

On the 9th day of September, A. D., 1831, David Brown and his wife, by their deed of that date did convey and assure for the consideration aforesaid, to the said Vincent Field the tract of land above mentioned; which deed contains the same exception and reservation above mentioned, and in the same words.

On the 25th day of February 1831, Vincent Field entered into an agreement with William Gibson, in which for, and in consideration of the sum of 175 dollars and 4 cents, he sold all his right, title and interest ("excepting a reserve mentioned in an article between David Brown and Vincent Field") to a part of the tract of land containing 63 acres more or less, to the said William Gibson, his heirs and assigns, and engaged to convey to him and his assigns the same premises, except about four acres which he was to convey to Joseph Smedley, in pursuance of an article between William Gibson and him.

On the 13th of September 1831, Vincent Field and wife, for the consideration expressed in the above agreement, conveyed and as-

[Gibson v. Tyson.]

sured to William Gibson, his heirs and assigns, the part of the tract agreed as above mentioned to be conveyed, describing it by metes and bounds: " containing sixty acres more or less, together with all and singular the rights, members and appurtenances whatsoever thereunto belonging or any wise appertaining thereunto, and the reversions and remainders, rents, issues, and profits thereof (excepting and reserving for himself, his heirs, executors, administrators and assigns, all mineral or magnesia of any kind, and to convey the same away through the premises intended to be sold, so as to do as little damage to the holder as possible, with all bricks and blocks of soapstone, as I, the said Vincent, may want for my own use.)

It is under this deed that William Gibson, the defendant, claims the property in the chrome, which is the subject of this controversy.

The plaintiff claims under the reservation in the articles and deed of David Brown to Vincent Field as follows:

David Brown, on the 18th of November 1830, by articles of agreement with Mahlon H. West, granted to him and his assigns the exclusive title, right and privilege of digging, &c., and removing from a tract of land sold by the said Brown to Vincent Field, lying in Little Britain township, chromate of iron and magnesia mineral for the term of three years, &c.

On the 18th of May 1831, Mahlon H. West assigned these articles to Isaac Tyson, Jun., the defendant; under this agreement he proceeded to dig and raise the ore in question.

The plaintiff requested the court to charge the jury on the following points of law:

1. That the plaintiff has shown full title to the ore in dispute; for the reservation in the article of agreement of 3d April 1830, and in the deed of 9th September 1831, from David Brown to Vincent Field, vested Brown with the right to all minerals of every description found on the premises sold; and his agreement of the 18th of November 1830, with Mahlon H. West, and the subsequent assignment of it on the 5th of April 1831, conveyed to the plaintiff, during its continuance, all the right reserved by Brown, and hence the verdict should be in favour of the plaintiff, for the value of the ore agreed upon by the parties.

2. That upon the evidence given in the cause, the true construction of the reservation in the article of agreement, of the 3d of April 1830, and in the deed of the 9th of September 1831, can only be attained by extending it to all minerals; for to restrict it to the article of magnesia would be to destroy the manifest intention of the parties, to whom the existence of chrome on the premises as a mineral was known; the parol testimony leaving it uncertain whether there be any magnesia there at all, and whether it was considered by them as a mineral or not.

3. That if the construction of the reservation be at all doubtful, yet as it is in the disjunction, the right of election is with the grantor, David Brown, and his assigns.

[Gibson v. Tyson.]

The defendant requested the court to charge the jury upon the following points:

1. That the intention and meaning of the parties are the best guide to the proper construction of every contract; and to give effect to this intent, the ordinary import of words may be restrained, the rule being that when a grant is in general terms, the addition of a particular circumstance will operate by way of restriction and modification.

2. The true construction of the reservation in the contract in question, " all mineral or magnesia, &c., and all bricks and blocks of soapstone," &c., is, that the subsequent restrictive words are to be taken as explanatory of the former; and the reservation is, therefore, restricted to the particular minerals specified in such reservation.

3. That the circumstances attending a transaction may be called in aid to explain the intent of the parties; and if the jury believe that at the time of the agreement between Brown and Field, on the 3d of April 1830, neither party knew of the existence of chrome, nor had it in contemplation, the construction to give effect to the intent will restrain the general terms used to the particular articles specified in the reservation. The rule of law being that an exception shall be taken most favourably to the grantee; and, if there be any uncertainty or ambiguity, the grantee has the benefit which may arise from such defect.

Hayes, President. Whether the chromate of iron, for which this action of replevin is brought, is the property of William Gibson or not, must be ascertained from the true construction of the exception and reservation in the agreement and deed from David Brown to Vincent Field.

The question 'is, whether chromate of iron is, or is not included in the exception and reservation of " all mineral or magnesia of any kind." There can be no doubt that it is a mineral: all minerals, therefore, would include it. But, for the defendant it is contended that the words " all mineral," are to be restrained by what follows, " or magnesia;" that they are used in this clause as synonymous with magnesia as the disjunctive or clearly indicates; that the term minerals, taken in its utmost latitude would include every thing beneath the surface, or that might be dug out of the soil, excepting plants and vegetables alone; which could not have been the idea of the parties in this reservation ; that magnesia being a mineral, it would be absurd to suppose that the parties intended something additional to, or beside minerals by using that word; that with respect to chrome, there is no evidence that it was known to these parties as existing on the premises at the time of the articles executed between Brown and Field on the 3d of April 1830, which is manifest from the fact, proved by Vincent Field, that Brown valued the reservation at 50 dollars only.

On the part of the plaintiff, it is said that the construction insisted

on by the defendant, violates a primary rule of interpretation, which seeks to give effect to every term of a contract, *ut res magis valeat quam pereat*, that to attain this construction it is necessary to throw out five words without assigning to them any meaning whatever; that there being no magnesia found on the premises, this construction in effect renders the whole reservation inoperative; that the disjunctive or, implies a difference, not identity; and that the parties did probably suppose magnesia to be something else than a mineral; that the words "of any kind," show that the previous words "all minerals" were to be taken in a comprehensive sense, and the whole context requires that or should be construed as and; that upon such construction every word will have its operation, and the intent of the parties will be carried into effect.

The intention of the parties is what all interpretation, where the subject matter of a contract is lawful, must aim at discovering. This constitutes the agreement, no matter what words are used. It is the consenting minds—the concurring thought and will of the parties at the time of the agreement, that justice is called in to aid and to uphold.

But language being the chosen medium of communicating, and means of fixing the intention, where the terms are clear and explicit, and can be carried into effect, it is unnecessary and, indeed, improper to go further. Ambiguity is patent or open when it appears on the face of the contract; latent, when the expressions, considered in themselves, are free from confusion, but become doubtful and uncertain, when applied to the subject matter. The supreme court must have considered such ambiguity as existing in this case, having sent the same down to supply a deficiency in the case stated by the introduction of additional facts. Much evidence has been received going to show the transactions and knowledge of the parties, Field and Brown and Gibson, at the period when the reservation in question was made.

Let us first consider the terms of the reservation, independently of the extraneous facts; and then in connection with them.

1. The words "all mineral or magnesia of any kind" would appear to carry, of themselves, something more than magnesia alone; for if magnesia only were meant to be reserved, why use the other terms at all, or why use, all mineral, first? That or is sometimes used between two words bearing the same import, in the sense of the Latin *alias*, is not to be denied: but in these cases, it is believed, you may always transpose the equivalent terms without injury to the sense, the two being exactly synonymous. But here if all mineral means magnesia you cannot say, *e converso*, that magnesia means all minerals. The words "of any kind" also appear to belong by congruity of signification, though not by juxta-position, to the term all mineral. But attach them to which you will, they are equally inconsistent with the asserted synonymy of the phrases "all mineral" and "magnesia." Was it ever heard in any region that

[Gibson v. Tyson.]

the common understanding of the country assigned the same mean-
ing to those terms? that all minerals were nothing but magnesia?
This were a simplification beyond the dreams of philosophy.

The sense in which the words of a contract are to be understood,
is the ordinary one—agreeable to the common acceptation. The
term "mineral" is not very definite as to its limits; but I will ven-
ture to say, that in general and popular use, it means all ores and
other metallic substances found beneath the surface of the earth, and
all other substances which are the object of mining operations. Un-
questionably where magnesia is found beneath the surface, as it gene-
rally is, it is a mineral. In this contract I am inclined however to
think with the plaintiff's counsel, that the parties were under some
apprehension that magnesia was not properly comprehended by the
term mineral; that knowing it only by its usual form as a drug or
medicine, they thought it necessary to express it as reserved, lest
the general term mineral might not include it. This idea affords an
additional argument for annexing the ensuing words "of any kind"
to the term mineral, rather than to magnesia, since the manifest ig-
norance of the parties forbids the supposition that they were aware
of the various combinations in which magnesia is found, the hydrates,
the carbonates, the sulphates, &c.

From this view of the phraseology employed in the reservation,
it is clear that the conjunction or must be construed and—a con-
struction which when demanded by the sense, is sanctioned by many
precedents.

The phraseology of the reservation being thus adjusted the ques-
tion simply is, whether chromate of iron be a mineral or not?

It is answered by the remark, that this is a metallic substance found
beneath the surface of the soil—it is therefore a mineral. This con-
clusion has not been denied by the defendant; but the argument of
his counsel went to maintain, in the first place, the position that by
mineral nothing more was meant than magnesia; and, secondly, that
chrome was not in the contemplation of the parties, being *unknown*
to them at the making of their agreement on the 3d of April 1830.
The first position was confined to the patent ambiguity; the second
to the latent.

2. As a latent ambiguity is shown to exist by extrinsic testimony,
it must, by such testimony, be explained.

The testimony in the present case, which has been adduced for
that purpose, proves it to have been long believed in the neighbour-
hood, that this tract of land, and especially that part of it called
Soapstone Hill, contained some valuable minerals. For sometime,
it was thought there was silver upon it. Searches were made up-
wards of fifty years ago, for that metal. Holes were dug and some
of the minerals obtained from them, were carried to England for
analysis. The tract was originally "taken up" as mine land, and so
called. The testimony further shows that at the time David Brown
entered into his agreement with Field, he was aware of this belief

and entertained it himself, though he was uncertain with respect to the species, properties or characters of the minerals. He spoke of gold, silver and magnesia. In consequence of this belief, he made the reservation in the articles, which were deliberately framed, after much consultation with his family. It appears that soon afterwards, and long before he executed his deed to Vincent Field, he was informed of the existence of chrome, so called, upon the land, and more than nine months previous to that time he entered into the contract with Mahlon H. West, granting him the exclusive privilege of raising and taking away chromate of iron and magnesia for three years; that Vincent Field, in the mean time, knew of searches which were made on this tract for minerals without interfering to prevent them or making any objection; but on the contrary, assisted a few weeks after his contract in showing D. Brown and the person who first discovered chrome and designated it as such, where his father had, many years before, dug in search of silver and thrown out a quantity of this mineral, now known to be chrome; that the existence of it on the Soapstone Hill, had been long known to others, who were not apprised of its properties or name.

It appears, then, that both parties, Brown and Field, came to the knowledge of the fact that the mineral called chrome or chromate of iron, was found on this tract before the indenture between them of the 9th of September 1831, was executed, in which indenture the identical reservation of the articles of the 3d of April 1830, is repeated *verbatim*. Although Brown had nine months before granted, under this reservation, the exclusive privilege of raising and taking away this very mineral, and Field knew it, and knew that men had been employed in digging it up for the person holding that lease or privilege, yet neither Brown nor Field thought of altering or modifying the reservation, as not being sufficiently comprehensive to include chromate of iron; nor did the latter complain, at any time, that Brown in granting the privilege of digging and carrying away the chromate of iron, was acting out of his reservation, or encroaching upon his, Field's, right; and his forbearance to notice this was not the less remarkable from the fact, that he had himself previously entered into a contract with William Gibson to convey that part of the tract to him, on wich this mineral had been found.

These facts do, in my opinion, remove every shadow of doubt that the parties did intend, by the terms of the reservation, to include the chromate of iron, and did understand, at the consummation of their contract by the deed of the 7th of September 1831, that this mineral was reserved.

I accordingly think that the verdict in the present case ought to be rendered for the plaintiff.

*Champneys* and *Ellmaker*, for plaintiff in error, on the subject of the construction of contracts, and the effect of words particularly descriptive upon previous general terms, cited Connor *v.* Hender-

son, 15 *Mass. Rep.* 305; Chess *v.* Chess, 1 *Penns. Rep.* 32; Appleton *v.* Boyd, 7 *Mass. Rep.* 131; Bartlet *v.* Delprat, 4 *Mass. Rep.* 702; Clarke *v.* Waite, 12 *Mass. Rep.* 439; Alexander *v.* Gould, 1 *Mass. Rep.* 165; Packer *v.* Gonsalus, 1 *Serg. & Rawle* 526; Lyman *v.* Clarke, *Norris's Peake,* 184; 9 *Mass. Rep.* 235; 5 *East* 51; Nicoll *v.* The Trustees of Huntington, 1 *Johns. Chan.* 183; Jackson *v.* Gardner, 8 *Johns.* 394; 3 *Atk.* 9; Whallon *v.* Kaufman, 19 *Johns.* 97; 1 *Pow. on Con.* 230, 237.

*Montgomery* and *Jenkins,* for defendant in error, cited, 1 *Saund. Rep.* 61, *note* 1; Roth *v.* Miller, 15 *Serg. & Rawle* 107; 2 *Wend. Rep.* 423; Stouffer *v.* Coleman, 1 *Yeates* 393; Hollingsworth *v.* Fry, 4 *Dall.* 347; 2 *Fonbl.* 36; 2 *Atk.* 73, 578; 1 *Eq. Ca. Ab.* 185; 1 *Ves.* 491; *Amb. Rep.* 93; 2 *Cowen* 195; Fowle *v.* Bigelow, 10 *Mass.* 384. To carry into effect the apparent intention of parties to a contract, " or" may be made to read " and," 1 *Wend. Rep.* 388; Jackson *v.* Blanshan, 6 *Johns.* 54; 1 *Wend. Rep.* 228; 2 *Wend. Rep.* 423, 517.

The opinion of the Court was delivered by

KENNEDY, J.—There is nothing in the first two errors assigned, that would justify or warrant a reversal of the judgment, for the evidence given under these exceptions was not such as could have, in the slightest degree, prejudiced the defendant below with the jury. But admitting, for the sake of argument, that the evidence objected to might have influenced the jury in deciding facts improperly against the defendant below, still, I should doubt the propriety of reversing the judgment for that reason, if from the other facts and circumstances testified to by the witnesses, taken in connection with the language of the exception in the deed, we should be of opinion that the plaintiff below was entitled to recover; for the parties having by consent withdrawn the case from the jury, and agreed that all the facts which the whole evidence tended to prove should be considered as found by the jury in the form of a special verdict, and that the same should be submitted under that view to the court for its decision, I confess that I can perceive no good objection to the court's separating and excluding from its consideration all those facts, proved exclusively to exist by the evidence improperly admitted, and thus decide the case entirely upon the facts established by the adduction of the proper evidence.

The three remaining errors grow out of the construction which the court put on the exception contained in the deed from David Brown and his wife to Vincent Field, and the facts and circumstances having relation thereto, which were given in evidence, or may perhaps more properly be said to be exceptions to the course of reasoning pursued by the judge, in coming to the conclusion that he did, but in truth may be considered as one error, to wit, that the court erred in giving judgment for the plaintiff, instead of the defend-

[Gibson v. Tyson.]

ant below. If the judgment be such as the court below ought to have given, it is immaterial whether the reasons assigned for it be the best that might have been advanced, or whether they tend to support the judgment at all or not; a critical examination, therefore, of them is unnecessary; but still I do not wish to be understood as insinuating that they, or any of them, are exceptionable in any respect whatever.

It appears to me that the facts and circumstances testified to by the witnesses, when taken in connection with the words of the exception in the deed, are sufficient to support the claim of the plaintiff below. The construction of all instruments of writing ought to be favourable, and as near to the minds and apparent intent of the parties as possible it may be, and the law will permit, for *benigne sunt faciendæ interpretationes chartarum propter simplicitatem laicorum. Et verba intentioni non e contra debent inservire.* Co. *Litt.* 313; *Litt.*, *sect.* 563; *Plowd.* 154, 160; 1 *Shep. Touch.* 86. Agreements ought, most certainly, to be construed according to the meaning and understanding which the parties had of them at the time they were made and entered into; for it is perfectly manifest, that if the meaning and intention of the parties be isregarded or departed from, in attempting to put a construction upon their agreement, it is in reality making a new agreement between them, instead of expounding the old; and it must be admitted that neither courts nor juries have the power to do this; the first, and indeed the only matter then is, to ascertain, if possible, what the parties intended and gave their assent to, by making the agreement in question.

I cannot believe, as has been contended by the counsel for the plaintiff in error, that it would comport with their intention to consider the term "magnesia" an explanation and restriction merely of the preceding words, "all minerals," because, had they known the meaning of those terms among those who have any scientific knowledge on the subject, it is utterly impossible that they, intending to except magnesia alone out of the grant, could ever have thought of introducing into the exception, with that view, the words "all minerals." But supposing the parties to be, as certainly they were, entirely destitute of all scientific knowledge in regard to such things, the introduction of these words is easily accounted for. With the bulk of mankind, magnesia is not considered a mineral at all. Nothing is thought by them to be such unless it be of a metallic nature, such as gold, silver, iron, copper, lead, &c.; magnesia, therefore, could not have been considered by the parties as a qualification or restriction of the preceding words, "all minerals," but was clearly intended as an addition thereto. Besides, is it not rather absurd, to suppose that they would have used the adjunct "all," in connection with the noun "minerals," if they had intended using the term "magnesia" for the purpose of restricting or confining the exception to that particular species of mineral? I also think that the words

V.—F

[Gibson v. Tyson.]

" of any kind," immediately following the word " magnesia," tend still further to show that the parties intended to embrace magnesia within the exception, in addition to what they considered minerals, because magnesia is very little known, if at all, to most of the people in the country, except in the one form in which they use it occasionally as a medicine, and they have no knowledge whatever of there being more kinds than one of it; and hence I infer that the words " of any kind" were used in reference to the word " minerals" alone, of which every body knows and believes there are several kinds. But if any possible doubt could remain as to the magnesia being considered by the parties as something in addition to the minerals mentioned in the exception, it is removed by the testimony of Vincent Field, the party himself to the contract, from whom the plaintiff in error derives his claim to the property in dispute, and whom he has also produced as his witness. He testifies that when he came to read the article, before signing it, " he found in it mineral and magnesia; that he then said to Brown, Nothing had been mentioned about magnesia; that he expected he was to have the magnesia; to which Brown replied that ' he thought proper to reserve it, and if the witness chose to take the property in that way, well and good;'" thus showing, most explicitly, that the magnesia was considered by them as something different from minerals, to the reservation of which latter no objection whatever was made, but merely to the magnesia, because it was something new that had been superadded, without any previous mention being made of it in making the bargain.

But it has been objected, that according to the ordinary and common acceptation of the term " mineral," chrome is not included within the exception, because, although properly a mineral, yet, not being a metallic substance, it is not considered by the great mass of mankind as a mineral, and embraced within that term. This objection would certainly have great weight, and perhaps could not be easily overcome, were it not for the parol evidence, and the facts established by it. This evidence, however, shows, very clearly, that it was that which is now known to be chrome, that, on the first taking up of the land in which it is found, gave to it the name of " mine land;" that it was thought to be a metallic ore of some kind, and spoken of frequently as containing some gold or silver. From the testimony of Field himself, it is plain that this is the same material to which Brown had particular reference, when Field talked of buying the land of him; and it cannot be doubted, I think, that he had the term " minerals" introduced into the exception contained in the article of agreement, for the especial purpose, it would seem, of embracing it, let it be what it might, so it were a mineral of more than ordinary value. Vincent Field says that Brown called it the *precious stuff*, when he first proposed buying the land of him. And again, when they made their verbal agreement, he talked of reserving the gold and silver, supposing, doubt-

[Gibson v. Tyson.]

less, that this substance might contain a portion of one or other, fi not both of these metals, and evidently alluded to it in such a way as to be so understood by Field himself; but when he comes to have the agreement reduced to writing, he does not confine or restrict himself by reserving merely the gold and silver, but excepts " all minerals of any kind," or, in other words, " of *every kind whatsoever;*" it also appears from the evidence that Gibson, the plaintiff in error, was present when the contract was concluded between Brown and Field, and that Gibson, after he bought of Field, seemingly admitted, that under the exception in the deed, Brown, or his assignees, had a right to the chrome found on the surface of the land, but not to that which was under it. This looks somewhat like an attempt, on his part, to evade what he felt conscious was the true meaning of the exception, that chrome was really embraced within it. Now as the *substance* in question turns out to be a mineral, and one of very considerable value too, I think it would be going too far to hold, under all the circumstances given in evidence, that it was not intended to be included within the exception. And though Field swears that he did not know what *mineral* meant, and in this state of ignorance signed the agreement, yet this ought not to affect the rights of Brown, or those claiming under him, because Field might have inquired and informed himself of it, if he did not know. And as he did not disclose his ignorance, it cannot be even pretended that Brown was bound to give, or to attempt any explanation of it to him.

Judgment affirmed.