65 A.3d 885

**John E. BUTLER and Mary Josephine Butler, Appellants**

v.

**CHARLES POWERS ESTATE, By Charles A. WARREN, Administrator of the Estate of Charles Powers, and Charles Powers, individually, his Heirs (William Pritchard and Craig L. Pritchard) and Assigns Generally, Executors, Administrators, Legatees, Grantees, and All Other Persons Claiming By or Through the Said Parties and All Other Persons Interested in Said Property, Appellees.**

Supreme Court of Pennsylvania.

Argued Oct. 16, 2012.

Decided April 24, 2013.

2

Gregory James Krock, Buchanan Ingersoll & Rooney, P.C., Pittsburgh, Thomas Francis Meagher III, Montrose, for Appellant.

George A. Bibikos, David R. Fine, K & L Gates, L.L.P., Harrisburg, for Chief Oil & Gas LLC and Southwestern Energy Production Company, Appellant Amicus Curiae.

Karen Colleen Daly, Michael Lee Kichline, William T. McEnroe, Dechert, LLP, Philadelphia, Argia Joanna DiMarco, Philadelphia, for Marcellus Shale Coalition, Appellant Amicus Curiae.

Nathaniel Isaac Holland, Russell Lane Schetroma, Steptoe & Johnson, PLLC, Meadville, for American Association of Professional Landmen, Appellant Amicus Curiae.

Kevin Jon Moody, for Pennsylvania Independent Oil & Gas Association and The American Petroleum Institute, Appellant Amicus Curiae.

Laurence M. Kelly, Montrose, for Appellee.

4

Before: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice BAER.

We granted allowance of appeal to consider whether a deed executed in 1881, which reserved to the grantor the subsurface and removal rights of "one-half [of] the minerals and Petroleum Oils" contained beneath the subject property, includes within the reservation any natural gas contained within the shale formation beneath the subject land known as the Marcellus Shale Formation.[1] The trial court in this matter, relying on the 1882 decision of this Court in *Dunham & Shortt v. Kirkpatrick*, 101 Pa. 36 (Pa.1882), and its progeny held that because the deed reservation did not specifically reference natural gas, any natural gas found within the Marcellus Shale beneath the subject land was not intended by the executing parties to the deed to be encompassed within the reservation. The Superior Court reversed that decision and remanded the case with instructions to the trial court to hold an evidentiary hearing complete with expert, scientific testimony to examine whether: (1) the gas contained within the Marcellus Shale is "conventional natural gas"; (2) Marcellus shale is a "mineral"; and (3) the entity that owns the rights to the shale found beneath the property also owns the rights to the gas contained within that shale. *See Butler v. Charles Powers Estate*, 29

1. In general, shale gas is a term used to define natural gas that has become trapped within various shale formations throughout North America. Marcellus shale natural gas is that gas which is located in the Marcellus Shale Formation, which covers 104,067 square miles in Ohio, West Virginia, Pennsylvania, Maryland, and New York. U.S. Energy Info. Agency, *Energy in Brief: What is shale gas and why is it important?*, *available at* http://www.eia.gov/energy_in_brief/article/about_shale_gas.cfm (last updated Dec. 5, 2012); U.S. Energy Info. Agency, *Annual Energy Outlook 2012* 58 tbl. 15 (June 2012). According to the latest projections by the USEIA, the Marcellus region contains approximately 140 billion cubic feet of "technically recoverable" natural gas. *Annual Energy Outlook 2012* 58 tbl. 15. To the extent we discuss the formation at large, we will refer to it in shorthand as "the Marcellus Shale." To the extent we discuss the sedimentary rock and the gas therein, we will refer to it as "Marcellus shale" or "Marcellus shale natural gas."

A.3d 35, 43 (Pa.Super.2011). For the reasons that follow, we respectfully hold that the Superior Court erred in ordering the remand for an evidentiary hearing and reinstate the order of the trial court.

## I.

Appellants in this matter, John and Mary Josephine Butler, own 244 acres of land in Susquehanna County. Appellants' predecessors in title obtained the land in fee simple by deed in 1881 from Charles Powers. The deed contained the following reservation:

> [O]ne-half the minerals and Petroleum Oils to said Charles Powers his heirs and assigns forever together with all and singular the buildings, water courses, ways, waters, water courses, rights, liberties, privileges, hereditaments, and appurtenances, whatsoever there unto belonging or in any wise appertaining and the reversions and remainders rents issues and profits thereof; And also all the estate right, title interest property claimed and demand whatsoever there unto belonging or in any wise appertaining in law equity or otherwise however of in to or out of the same.

*Id.* at 37.

On July 20, 2009, Appellants filed a complaint to quiet title in the Susquehanna County Court of Common Pleas, alleging ownership of the property in fee simple and ownership, through adverse possession, of all (as opposed to one-half) of the minerals and petroleum oils contained beneath the property. The Estate of Charles Powers and his heirs and assigns were originally named as defendants. After some initial difficulty in locating representatives of the estate, on September 21, 2009, William and Craig Pritchard (Appellees) surfaced as rightful heirs to the Powers' Estate. Eventually, Appellees filed a motion for declaratory judgment, seeking a holding from the trial court that the deed reservation included one-half of all natural gas located within any Marcellus shale found beneath the property. Appellants filed a preliminary objection in the form of a demurrer, arguing that pursuant to long-standing precedent of this Court, a deed reservation does not

contemplate or include natural gas unless expressly stated therein. *Accord Highland v. Commonwealth,* 400 Pa. 261, 161 A.2d 390 (1960); *Dunham, supra.*

The trial court agreed with Appellants, sustained the demurrer, and denied Appellees' request for declaratory relief. The court noted that Pennsylvania law has long recognized a rebuttable presumption that "if, in connection with a conveyance of land, there is a reservation or an exception of 'minerals' without any specific mention of natural gas or oil, . . . the word 'minerals' was not intended by the parties to include natural gas or oil." *Highland,* 161 A.2d at 398 (citing *Dunham,* 101 Pa. at 44). This precept, commonly known as the *Dunham* Rule, may be rebutted by a challenger through clear and convincing evidence that the intent of the parties, at the time of the conveyance, was to include natural gas and/or oil. *Id.* at 400. The trial court finally stated that the notion that natural gas and oil are not, for purposes of private deed transfers, considered minerals is "entrenched" within Pennsylvania law. *See* C.C. Marvel, Annotation, *Oil and gas as "minerals" within deed, lease, or license,* 37 A.L.R.2d 1440, at *3.

Appellees appealed to the Superior Court, a panel of which reversed in a published opinion. *Butler,* 29 A.3d at 43. The panel also remanded the case to the trial court for an evidentiary hearing replete with expert testimony "on whether Marcellus shale constitutes a type of mineral such that the gas in it falls within the deed reservation." *Id.* While the court extensively recounted *Dunham, Highland,* and related cases, it determined that those "decisions do not end the analysis" because of a 1983 decision of this Court, *United States Steel Corporation. v. Hoge,* 503 Pa. 140, 468 A.2d 1380 (1983) (*Hoge II*). Briefly, the *Hoge II* Court considered which party controlled access to "coalbed gas," a dangerous by-product of coal mining contained within coal seams, pursuant to reservations contained within various private deeds. Those reservations gave U.S. Steel the exclusive rights to mine and remove coal within a specific coal seam, while keeping with the property owners all oil and natural gas rights below the coal seam. In considering which party possessed the right to the

coalbed gas, the *Hoge II* Court noted, "as a general rule, subterranean gas is owned by whoever has title to the property in which the gas is resting." *Id.* at 1383. Without discussing the *Dunham* Rule, the *Hoge II* Court concluded, "such gas as is present in coal must necessarily belong to the owner of the coal." *Id.* Thus, U.S. Steel, as the owner of the coal, possessed the rights to the coalbed gas contained within the coal seam. *Id.*

The Superior Court in this case found that because of the *Hoge II* decision, the trial court erred in sustaining Appellants' demurrer based upon *Dunham* and *Highland* without first conducting an evidentiary hearing to determine whether: Marcellus shale natural gas constitutes that which is contemplated by the *Dunham* Rule; Marcellus shale itself is a mineral; and Marcellus shale is similar to coal so that the *Hoge II* holding should apply to this case, resulting in Appellees owning one-half of the natural gas rights because of the *situs* of the gas in shale. *Id.* In effect, the remand order directed the trial court to consider whether the *Hoge II* Court's logic *vis-a-vis* coalbed gas and coal scientifically and legally applied to natural gas contained within the Marcellus Shale. Appellants petitioned this Court for allowance of appeal, which we granted to consider the following issue:

> In interpreting a deed reservation for "minerals," whether the Superior Court erred in remanding the case for the introduction of scientific and historic evidence about the Marcellus [S]hale and the natural gas contained therein, despite the fact that the Supreme Court of Pennsylvania has held (1) a rebuttable presumption exists that parties intend the term "minerals" to include only metallic substances, and (2) only the parties' intent can rebut the presumption to include non-metallic substances.

*Butler v. Powers Estate,* 41 A.3d 854 (Pa.2012) *(per curiam ).*

## II.

### *(A) The Dunham Rule and its Progeny*

Before delving into the parties' arguments, we find it prudent to recount the history of the *Dunham* Rule to facilitate a

full understanding of the issues before us. While *Dunham* was decided in 1882, the doctrine for which that case has become well-known has its genesis in the 1836 decision of *Gibson v. Tyson*, 5 Watts 34 (Pa.1836). In *Gibson*, a deed reserved to the grantor of land "all minerals or magnesia of any kind" contained beneath the property. *Id.* at 36. The Court was tasked with determining whether chrome (also known as chromate of iron) should be encompassed within the "all minerals" portion of the reservation. The Court noted that "the first, and indeed the only matter then is, to ascertain, if possible, what the parties intended and gave their assent to by making the agreement in question." *Id.* at 41. In determining the parties' intent, the court continued, to people "entirely destitute of scientific knowledge in regard to such things ... [to] the bulk of mankind, ... [n]othing is thought by [minerals] to be such unless it be of a metallic nature, such as gold, silver, iron, copper, lead, [etc.]...." *Id.* Reluctantly, the Court determined that chrome would be considered by "the bulk of mankind" as a mineral because it was commonly thought to be of a metallic nature, akin to gold or silver, as demonstrated by parol evidence introduced before the trial court. *Id.* at 42. Thus, the Court held the reservation specifying minerals included chrome based upon a common usage understanding, as opposed to any scientific basis.

A year later, this Court reaffirmed the holding of *Gibson* that contracts such as those presented in deed reservation cases should be examined from a non-scientific viewpoint. *Schuylkill Nav. Co. v. Moore*, 2 Whart. 477 (Pa.1837). The *Moore* case, which considered how a contract concerning hydraulic machinery should be examined, first noted that "the best construction is that which is made by viewing the subject of the contract, as the mass of mankind would view it; for it may be safely assumed that such was the aspect in which the parties themselves viewed it." *Id.* at 491. It then concluded that the interpretation of the contract should be governed by common or lay understanding, and not scientific principles. *Id.* at 493.

With the notion that the common-man comprehension of terms included in contracts should be used, this Court in *Dunham* examined an 1870 deed, which reserved to the grantor "all the timber suitable for sawing; also all minerals," to determine whether the reservation included oil within the term "all minerals." *Dunham*, 101 Pa. at 37. The Court first noted the reluctance of the *Gibson* Court to find chrome a mineral absent parol evidence; thus, it queried whether oil, which unquestionably was regarded "by science and law" as a mineral solely because of its inorganic character, should likewise be considered a mineral to laypersons. *Id.* at 44. To answer this question, this Court considered whether the deed should be viewed through the lenses of "scientists; or as business men, using the language governed by the ideas of every-day life?" *Id.*

The Court followed the lead of *Gibson* and *Moore* and held that a common understanding of the word "minerals" should be used. The Court resolved that, should the scientific construction of the term mineral, *i.e.*, anything inorganic, be used, the term would be as "extensive as the grant, hence work[ing] its own destruction." *Id.* Accordingly, using the common understanding of mankind, the court determined that oil is not a mineral pursuant to the framework laid by the *Gibson* Court that minerals are of a metallic nature. Thus, for the deed reservation to include oil, it must specifically be included within the clause.

This Court next encountered a deed reservation and the *Dunham* Rule in *Silver v. Bush*, 213 Pa. 195, 62 A. 832 (1906). There, the deed contained a reservation clause specifically for "the mineral underlying the [property], and the right of way to and from said mineral. . . ." *Id.* at 833. The Court took the case explicitly to resolve the question of how oil and natural gas should be construed in the reservation. In answering the question, the Court viewed the term "mineral" from three different vantages: scientifically, commercially, and ordinarily. Scientifically, oil and gas are clearly minerals because the world of science has three "kingdoms" of material—animal, plant, and mineral—and oil and gas are obviously not animals

or plants. *Id.* Commercially, minerals had been said to include anything from the ground that has value upon being separated from its *situs*. *Id.* In an ordinary sense, however, the *Silver* Court reaffirmed the notion that minerals are those substances that the "popular estimation" would consider minerals. *Id.*

The Court then cited, and approved, the *Dunham* holding vis-à-vis petroleum oil: that the general consensus of nonscientists was that oil is not a mineral because it is not metallic in nature. *Id.* It then held, albeit in conclusory fashion, the same concerning natural gas: "*a fortiori,* natural gas would not be so included." *Id.* The Court concluded that the *Dunham* Rule has been a rule of property law upon which many Pennsylvania lands of title rest and, therefore, absent clear and convincing intent by the parties to the contrary, the deed reservation did not include oil or natural gas. *Id.* at 833–34.

Shortly thereafter, this Court again reaffirmed *Dunham,* and indeed *Silver,* in *Preston v. S. Penn Oil Co.,* 238 Pa. 301, 86 A. 203 (1913). The *Preston* Court noted that other jurisdictions have not followed the *Dunham* Rule, and instead favored oil and natural gas being included within general mineral grants. However, in holding that an 1876 deed reserving all mineral and mining rights and the appurtenances thereto did not include petroleum or natural gas rights, we stated that the dissonance between jurisdictions could be attributed to differences in the popular understanding of the character of petroleum oil as its production became more widespread. *Id.* at 204. Nevertheless, this Court reiterated that *Dunham* "has been the law of this state for 30 years, and very many titles to land rest upon it." *Id.* Accordingly, as a rule of property, this Court refused to disturb it. *Id.*

Forty years later, this Court again considered the *Dunham* Rule in *Bundy v. Myers,* 372 Pa. 583, 94 A.2d 724 (1953), which involved a deed reservation that excepted out "oil, coal, fire clay and minerals of every kind and character with rights of entry for the purpose of removal of the same." *Id.* at 725. On a challenge of whether the deed reservation also included natural gas, the trial court concluded that natural gas was

included, reasoning: "at the time of the deed in 1884, it was well known that natural gas was frequently found along with oil, [thus] it was the intention of the parties that gas was also reserved." *Id.* This Court reversed the trial court's decision, however, by again reaffirming the vitality and the absoluteness of the *Dunham* Rule in Pennsylvania.

First, we again recognized that as oil and gas production expanded throughout the country, other states had come to differing results concerning the status of oil and gas as minerals vis-à-vis deed reservations. *Id.* at 726. Echoing the *Silver* and *Preston* Courts, however, our Court stated that the *Dunham* Rule had now been Pennsylvania law for seventy years and remained a viable and well-established rule of property not to be disturbed. *Id.* For purposes of the deed reservation in question, then, "[i]f the oil and gas were intended to be included in the 'minerals' reserved, then why was the oil expressly reserved? *Expressio unius est exclusio alterius.*" *Id.*[2] As with cases such as *Silver,* if the actual intent of the parties was to include natural gas within the reservation, that intent must be affirmatively averred and proven if the plain language of the reservation does not specify the inclusion of natural gas.

Our extensive examination of the *Dunham* Rule concluded in 1960 in *Highland v. Commonwealth,* 400 Pa. 261, 161 A.2d 390 (1960). *Highland* concerned the grant of several tracts of land by several different deeds, some of which only reserved the subsurface rights to "coal, coal oil, fire clay and other minerals of every kind and character," while other deeds expressly contained reservations for natural gas. *Id.* at 393. Citing to the litany of cases already discussed above, the *Highland* Court put into plain and simple terms what over one hundred years of case law had combined to say:

> If, in connection with a conveyance of land, there is a reservation or an exception of 'minerals' without any specific mention of natural gas or oil, a presumption, rebuttable in nature, arises that the word 'minerals' was not intended by

2. "The express mention of one thing excludes all others."

the parties to include natural gas or oil. [ ... ] To rebut the presumption [ ... ] there must be clear and convincing evidence that the parties intended to include natural gas or oil within [minerals].

*Id.* at 398–99.

The Court did so while recognizing, as did its predecessors, that mankind generally divided all known matter into three categories—animal, vegetable, and mineral—and that petroleum and natural gas are unquestionably minerals under that broad categorization. *Id.* at 398. Nonetheless, we reaffirmed that for deed reservations we must assume, absent evidence to the contrary, that mineral is a term of "general language, and presumably is intended in the ordinary popular sense which it bears among English speaking people," *i.e.*, metallic substances and not oil and gas. *Id.* Thus, the *Dunham* Rule, a well-established and relied upon rule of property, continues to bind all situations in which a deed reservation does not expressly include oil or natural gas within the reservation. *Id.* at 398–99. Indeed, such a conclusion was demanded by the long-standing jurisprudence of this Commonwealth concerning property law: "A rule of property long acquiesced in should not be overthrown except for compelling reasons of public policy or the imperative demands of justice." *Id.* at 399 n. 5 (quoting, *e.g.*, *Smith v. Glen Alden Coal Co.*, 347 Pa. 290, 32 A.2d 227, 234 (1943)).

### (B) United States Steel Corp. v. Hoge

As noted, the Superior Court in this case found the *Dunham* progeny did not end the analysis because of *Hoge II*. Thus, we turn next to that decision. In the late 1970s, a question was raised concerning so-called "coalbed gas," which is a combination of methane, ethane, propane and other gases. Within the coal mining and natural gas industries, coalbed gas, which is found within crevices and empty pockets in coal seams and commonly known among miners as "firedamp," bears "little if any distinction [from] the gas found in oil-and-gas-bearing sands (natural gas)." *U.S. Steel Corp. v. Hoge*, 304 Pa.Super. 182, 450 A.2d 162, 173 n. 16 (1982) (*Hoge I* ).

As detailed below, the *Hoge* case examined the ownership of coalbed gas.

In the 1970s, various landowners in Greene County obtained deeds to tracts of land that, through a single predecessor, had already relinquished all rights to the coal contained within the Pittsburgh Coal Seam underlying the surface of the subject properties to U.S. Steel. *Id.* at 163. U.S. Steel also possessed "the right of ventilation and drainage and the access to the mines for men and materials." *Id.* at 164 n. 3. The landowners retained, however, "the right to drill and operate through said coal for oil and gas without being held liable for any damages." *Id.* at 164. In 1977 and 1978, two related events occurred: U.S. Steel began operations of its Cumberland Mine in Greene County to remove the coal contained beneath the landowners' property pursuant to the coal reservations, and the landowners began drilling wells through the property "for the express purpose of recovering coalbed gas contained" within the subject coal seam. *Id.* The landowners utilized the process of hydrofracturing to obtain the coalbed gas.[3] U.S. Steel sought injunctive and declaratory relief in the Greene County Court of Common Pleas, contending that the drilling into the coal seam for coalbed gas constituted an unlawful trespass and that the hydrofracturing of the coal seam caused irreparable harm to the seam unquestionably owned by U.S. Steel. The trial court granted relief to U.S. Steel only in part, ruling that the landowners could drill for coalbed gas contained within the seam, because, in the trial court's view, the rights to the coal and the coalbed gas were separate. *Id.* at 168–69. However, the court prohibited the landowners from using hydrofracturing to obtain the gas. *Id.* at 165.

---

**3.** As accurately stated by the *Hoge I* Court, and as will be relevant to the case *sub judice,*

> Hydraulic fracturing or hydrofracturing is the use of fluids under pressure, which fluids are forced into the well hole causing the fracturing of the target stratum. With the hydrofracturing of coal beds the fractures in the coal vein serve as conduits or channels through which the gas may flow from the coal seam to the well's shaft.

*Id.* at 164 n. 5.

U.S. Steel appealed to the Superior Court, arguing that the coal and coalbed gas were essentially different aspects of the same substance; thus, to the extent U.S. Steel owned the coal, it also owned the coalbed gas.[4] In rejecting this claim, the Superior Court was "reminded of the so-called *Dunham* [R]ule, peculiar to the law of Pennsylvania, that natural gas is not a mineral, as that term is commonly understood...." *Id.* at 169. While recognizing that the *Dunham* Rule has been applied only to natural gas (and oil), the court found "no reason why we cannot employ it here by analogy, particularly when the rule was adopted nearly half a century before the execution of the coal severance deeds." *Id.* Concluding, then, that because there was no distinction between coalbed gas and other natural gases at the time the *Dunham* Rule was adopted, the court found that because the coal reservation did not specify natural gas, the landowners were entitled to drill into the seam for coalbed gas. *Id.* Accordingly, the court affirmed the judgment of the trial court.

U.S. Steel pursued a further appeal to this Court, which reversed the Superior Court's decision. Without discussing or, indeed, even citing to the merits of the *Dunham* Rule, this Court began its analysis by noting that "[g]as is a mineral, though not commonly spoken of as such, ... [and therefore] necessarily belongs to the owner in fee, so long as it remains part of the property...." *Hoge II*, 468 A.2d at 1383. Thus, we held that when a landowner conveys property rights to another, anything contained within the severed property, including all subterranean minerals, becomes subject to the ownership of the grantee. *Id.* "In accordance with the foregoing principles governing gas ownership, therefore, *such gas as is present in coal must necessarily belong to the owner of the coal,* so long as it remains within his property and subject to his exclusive dominion and control." *Id.* (emphasis in original).

In so holding, however, the *Hoge II* Court went on to make some critical distinctions concerning the unique nature of

---

4. Apparently, the landowners did not appeal the trial court's decision prohibiting the use of hydrofracturing methods.

coalbed gas. It noted that the commercial exploitation of coalbed gas was "very limited and sporadic" because it was generally viewed as a dangerous waste product of coal mining, which had to be vented from a coal seam to allow the coal to be safely mined. *Id.* at 1384. This Court therefore questioned why the landowners' predecessor would retain the right to a waste product with well-known explosive and dangerous predispositions? *Id.* at 1385. The answer, in this Court's opinion, was in the language of the deed reservations themselves, which explicitly left to the surface owners the unfettered right to all of the oil and gas below the severed coal seam.

> We find implicit in the reservation of the right to drill through the severed coal seam for "oil and gas" a recognition of the parties that the gas was that which was generally known to be commercially exploitable. It strains credulity to think that the grantor intended to reserve the right to extract a valueless waste product with the attendant potential responsibility for damages resulting from its dangerous nature.

*Id.*

### III.

Based on the foregoing, we now turn to the parties' primary arguments in this case. Appellants, advocating for the reversal of the Superior Court's remand order and reinstatement of the trial court's judgment, rely exclusively on the *Dunham* Rule and its consistent application for over one hundred years that natural gas is not included within a deed reservation without either (1) being explicitly contemplated within the reservation; or (2) clear and convincing parol evidence that the parties intended for natural gas to be included within the deed reservation, despite only a general reservation of minerals. As far back as *Gibson*, minerals have been defined in the law for private deed reservation purposes as those substances which are metallic in nature. Appellants note that the metallic character of the subject material constituted the common understanding of minerals to laypersons in the 1830s when

*Gibson* was decided, and that presumption has never been questioned or overruled by this Court.

From this premise, Appellants next point to the obvious: because "natural gas" is contained nowhere in the deed reservation, there was no explicit contemplation that the Powers' Estate would retain the right to one-half of the subsurface natural gas. Accordingly, Appellees bear the burden of proving, by clear and convincing evidence, that it was the intent of the parties executing the deed in 1881 that natural gas be contemplated within the deed reservation. Harkening back to *Gibson* and *Dunham*, Appellants argue that those courts were clear that the deed reservations are to be construed consistent with that which was understood by ordinary people at the time the deed was executed. Thus, before even considering any potential interpretation of the deed reservation, Appellants challenge the remand order by the Superior Court because scientific evidence as to what Marcellus shale is and is not considered presently would have no bearing on Appellees' burden of proving, by clear and convincing evidence, that the common-persons who executed the deed in 1881 would have contemplated and understood Marcellus shale, and therefore the gas contained within it, to be a mineral.

Finally, Appellants submit that even if scientific evidence is relevant, the Superior Court still erred in granting a remand because, contrary to Appellees' assertion before the Superior Court, natural gas found in the Marcellus Shale is not "unconventional and different" from natural gas found in any other geological formation or geographic region. According to the United States Energy Information Administration, natural gas and all shale gas are one and the same substance; it is the manner of drilling and production that is different. Indeed, shale gas is merely natural gas that has been trapped by the shale rock formation from reaching the sandy, higher levels in the ground. *See* Appellant's Brief at 22–23 (citing U.S. Energy Info. Agency, *Energy in Brief: What is shale gas and why is it important?, available at* http://www.eia.gov/energy_in_brief/article/about_shale_gas.cfm (last updated Dec. 5, 2012)). The trapping of the natural gas by shale rock forces gas

drillers to employ hydrofracturing to obtain the gas. *See supra* note 3. Thus, in Appellant's view, the Superior Court erred in ordering an evidentiary hearing concerning whether Marcellus shale gas and natural gas are different substances because, as an uncontestable matter of fact, they are the same. Accordingly, in summation Appellants assert that *Hoge II* cannot apply, as this case concerns exclusively natural gas and without (1) an express designation of natural gas within the deed reservation, or (2) clear and convincing evidence through parol evidence that the parties in 1881 intended to include natural gas within the reservation, the *Dunham* Rule controls and Appellees are not entitled to any natural gas rights.[5]

Appellees respond, first, by pointing to the plain language of the deed reservation, which reserved "one-half the minerals and Petroleum Oils ... together with all ... appurtenances, ... issues and profits thereof...." In an argument that was not raised below, Appellees contend that natural gas is an appurtenance, issue, or profit of petroleum oil, and thus is included within the plain language of the deed reservation. In Appellees' view, this additional "appurtenance" language, which was not contained in the deed reservations examined in the *Dunham* decision or the cases thereafter, takes this case out of the purview of the *Dunham* Rule, because this case may be decided on the plain language of the deed reservation alone.

Appellees further question whether the *Dunham* Rule is applicable to this appeal in a general sense, because the deed in this case was signed in 1881, one year before this Court announced the decision in *Dunham.* Even more broadly, Appellees question the continued vitality of the *Dunham* Rule, because various Pennsylvania statutes such as the Municipalities Planning Code, the *Hoge II* opinion, decisions from other jurisdictions, and written authorities contemporary to 1881 all state generally that natural gas is a mineral. Under this

5. Parenthetically, Appellants also note that the *Hoge* decisions contained a further distinguishing factor: the deed reservation there specifically contemplated the coal and ventilation of coalbed gas. No such reservation of any shale and the gas contained therein exists in the deed under scrutiny in this case.

reasoning, and regardless of the viability of the "natural gas as an appurtenance of petroleum oil" argument, Appellees urge us to hold the *Dunham* Rule inapplicable to this case. Either way, in Appellee's view, natural gas is specifically contemplated by the deed reservation.

Alternatively, Appellees argue that *Hoge II* stands for the proposition that "he who owns the shale owns the gas," and thus controls this case. Appellees' Brief at 22 (citing *Hoge II*, 468 A.2d at 1383 ("such gas as is present in coal must necessarily belong to the owner of the coal")). Appellees' argument is essentially that the gas is part of Marcellus shale; thus, to the extent Marcellus shale is a mineral,[6] the gas contained therein is contemplated by the deed reservation. Appellees liken the Marcellus Shale to Coca–Cola and the shale gas as the "fizz" that emanates from the liquid soda, arguing that no court could ever reason that the "fizz" is separate and apart from the Coca–Cola liquid. Here too, in Appellees' view, the shale gas is the "fizz" of the Marcellus Shale, and thus must be included within the deed reservation in accord with *Hoge II*.

Appellants filed a reply brief, challenging three specific parts of Appellees' argument. First, Appellants contend that any argument relating to the "appurtenance, issue, and profits of petroleum oil" portion of the deed reservation is waived pursuant to Rule 302 of the Rules of Appellate Procedure ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Appellants aver that Appellees bore the burden in the trial court of proving, by clear and convincing evidence, that natural gas was included in the deed reservation and, failing to make the "natural gas is an appurtenance of petroleum oil" argument in the trial court forecloses their ability to make the same contentions before this Court. Appellees' argument in the trial court focused solely on the "mineral" portion of the deed reservation, and therefore they cannot raise the separate appurtenance argument for the first time here.

**6.** Appellees contend that Marcellus shale contains various quantities of iron ore, therefore rendering Marcellus shale, *ipso facto*, a mineral.

Second, in Appellants' view, whether natural gas is a mineral under certain statutory sections is irrelevant to this case, which strictly involves common property law. Appellants note that recently this Court in *Huntley & Huntley, Inc. v. Borough of Oakmont*, 600 Pa. 207, 964 A.2d 855, 858 (2009), *quoted in* Appellants' Reply Brief at 8, explicitly recognized that while natural gas may be classified as a mineral under the Municipalities Planning Code, "Pennsylvania common law has applied a rebuttable presumption in the context of a private deed conveyance that the term 'mineral' does not include oil or gas." Finally, Appellants aver that Appellees' argument that the *Dunham* Rule cannot apply because the *Dunham* opinion was released a year after the deed in this case was executed is baseless. Appellants contend that *Dunham* was based wholly on *Gibson*, which had been in existence for forty-five years when the deed was executed. Under *Gibson*, Pennsylvania law was clear that minerals only encompassed, for private deed purposes, metallic substances. Moreover, the deed examined in *Dunham* dated to 1870, a full eleven years before the deed in this case was executed.

## IV.

We agree with Appellants that the appurtenance argument raised by Appellees has been waived, the *Dunham* Rule remains viable and controlling, *Hoge II* is distinguishable and inapplicable, and the Superior Court erred in ordering a remand for scientific evidence concerning the nature of the gas contained within the Marcellus Shale.[7] The *Dunham* progeny has been unwavering in its clarity that, absent the terms "oil" or "natural gas" being included within a reserva-

7. In examining the order of a trial court sustaining a preliminary objection in the form of a demurrer, we must consider all well-pleaded facts set forth in the complaint (here, captioned as a motion for declaratory relief) and all fairly-deducible inferences therefrom, in a light most favorable to Appellees as the non-moving party. *Seebold v. Prison Health Srvs., Inc.*, 57 A.3d 1232, 1243 (Pa.2012); *Krentz v. Consolidated Rail Corp.*, 589 Pa. 576, 910 A.2d 20, 26 (2006). Our standard of review is limited to deciding whether, on those facts and inferences, "the law says with certainty that no recovery is possible." *Bilt–Rite Contractors, Inc. v. The Architectural Studio*, 581 Pa. 454, 866 A.2d 270, 274 (2005).

tion for mineral rights within a private deed, oil or natural gas simply are not encompassed within the reservation without clear and convincing parol evidence produced by the proponent of the reservation to the contrary. For the following reasons, we find that the doctrine applies to this appeal.

## A.

Initially, as noted above, we agree with Appellants that Appellees' contention that Marcellus shale natural gas, or indeed natural gas in general, is an "appurtenance, issue or profit, or substance out of" petroleum oil, and therefore contemplated by the plain language of the deed reservation, is waived. Relevant to the issues presented in this appeal, Appellees based their motion for declaratory judgment in the trial court on three distinct arguments: the *Dunham* Rule is no longer viable in Pennsylvania; Marcellus shale natural gas is a mineral; and/or Marcellus shale is a mineral, and therefore the gas contained within it is contemplated by the deed reservation pursuant to *Hoge II*. *See* Brief on Behalf of Defendants in Support of Motion of Declaratory Judgment (filed Nov. 4, 2009), *found at* Reproduced Record 51a. Nowhere in the motion itself (which consists of a mere six paragraphs) or the more substantive brief in support thereof is the appurtenance argument raised, made, or even insinuated.

As can be expected, the trial court did not reference or discuss the appurtenance argument in its opinion denying the motion for declaratory judgment. Moreover, Appellees did not raise the appurtenance discussion in their appellants' brief to the Superior Court, nor did that tribunal address the issue. Accordingly, the issue of whether natural gas is an appurtenance, issue or profit, or substance out of petroleum oil is waived and is not before our Court for disposition. Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); *Oliver v. City of Pgh.*, 608 Pa. 386, 11 A.3d 960, 964–65 (2011) (holding that an argument not raised by the appellee before this Court, when that party was the appellant in the intermediate appel-

late court, cannot be used as a basis for affirming the decision of the intermediate appellate court); *In re J.M.*, 556 Pa. 63, 726 A.2d 1041, 1051 n. 15 (1999) ("since Appellee failed to raise [a specific] issue either before the trial court or Superior Court, the issue [has] been waived and was therefore, not preserved for appellate review.").[8]

### B.

■ We thus turn to the continuing viability of the *Dunham* Rule, and we reaffirm that the rule continues to be the law of Pennsylvania. First, as has been related herein, this Court has never explicitly questioned the vitality of the *Dunham* Rule. Like the *Silver* Court did in 1906, we recognize that the *Dunham* Rule has now been an unaltered, unwavering rule of property law for 131 years; indeed its origins actually date back to the *Gibson* decision, placing the rule's age at 177 years. As noted by this Court in *Highland*, "[a] rule of property long acquiesced in should not be overthrown except for compelling reasons of public policy or the imperative demands of justice." 161 A.2d at 399 n. 5. In our view, neither the Superior Court nor Appellees have provided any justification for overruling or limiting the *Dunham* Rule and its longstanding progeny that have formed the bedrock for innumerable private, real property transactions for nearly two centuries. Notwithstanding this Court's recognition that various statutes, such as the Municipalities Planning Code, categorize natural gas as a mineral, as Appellants aptly note, we recently reiterated that "Pennsylvania common law has applied a rebuttable presumption in the context of a private deed conveyance that the term 'mineral' does not include oil or gas."

---

8. We further note that this Court has treated oil and natural gas as separate substances for purposes of private deeds. *See, e.g., Highland*, 161 A.2d at 393 (treating deed reservations which contained only natural gas separately from other reservations); *Silver*, 62 A. at 833 (holding that if a deed reservation does not include oil, *"a fortiori*, natural gas would not be so included."). To that end, we reiterate what this Court in *Bundy* poignantly stated sixty years ago: "[i]f oil and gas were intended to be included in the 'minerals' reserved, then why was the oil expressly reserved? *Expressio unius est exclusio alterius."* 94 A.2d at 726.

*Huntley*, 964 A.2d at 858. We see no reason, nor has any party or court provided us with one, to depart from this entrenched rule.

## C.

■ We next examine whether the *Dunham* Rule applies to this appeal, and, readily hold that it does. At the outset, we note the obvious: the term "natural gas" is contained nowhere in the plain language of the deed reservation. Under the *Dunham* Rule, then, the burden is on Appellees to plead and prove, by clear and convincing parol evidence, that the intent of the parties when executing the deed in 1881 was to include natural gas within the reservation. *Highland*, 161 A.2d at 398–99. While Appellees have waived the contention that Marcellus shale natural gas is contemplated in the deed reservation as an appurtenance of petroleum oil, encompassed within the determination that *Dunham* applies is whether the Superior Court erred in remanding for an evidentiary hearing to determine whether Marcellus shale natural gas may be considered a mineral as contained within this deed reservation, despite the clear jurisprudence established by *Dunham*. We hold that the Superior Court erred in ordering the remand, and further that Marcellus shale natural gas cannot, consistent with the *Dunham* Rule, be considered a mineral for private deed purposes.

■ The *Dunham* Rule is clear, dating back to *Gibson*, that the common, layperson understanding of what is and is not a mineral is the only acceptable construction of a private deed. Notwithstanding different interpretations proffered by other jurisdictions, the rule in Pennsylvania is that natural gas and oil simply are not minerals because they are not of a metallic nature, as the common person would understand minerals. *Gibson*, 5 Watts at 41–42; *see also Dunham*, 101 Pa. at 44. The *Highland* decision made clear that the party advocating for the inclusion of natural gas within the deed reservation (here Appellees) bears the burden of pleading and proving by clear and convincing evidence that the intent of the parties who executed the reservation was to include natural gas. 161

A.2d at 398–99. Critically, however, such intention may only be shown through parol evidence that indicates the intent of the parties at the time the deed was executed—in this case, 1881. *Id.*

Of course, in 1881, the law of Pennsylvania was *Gibson* and *Moore, supra* pp. 889–90, which clearly stated two overarching principles: (1) anything of a non-metallic nature would not be considered a mineral for private deed purposes; *Gibson,* 5 Watts at 41–42; and (2) when interpreting private deeds and contracts, the "question is to be determined not by principles of science, but by common experience directed to the discovery of intention." *Moore,* 2 Whart. at 493; *see also Gibson,* 5 Watts at 44. Both of these principles have been adopted and utilized by the courts implementing the *Dunham* Rule. Accordingly, to the extent the Superior Court ordered an evidentiary hearing with expert testimony concerning Marcellus shale natural gas, and the scientific nature thereof, such an order violated the *Dunham* jurisprudence.[9] Simply put, natural gas is presumptively not a mineral for purposes of private deeds.

## D.

■ Finally, we disagree with the Superior Court that because the natural gas at issue in this case is contained within the Marcellus Shale, the *Hoge II* decision and its statement that "such gas as is present in coal must necessarily belong to the owner of the coal" become relevant or controlling. First, consistent with the above analysis *supra* Part IV.B–C, we reject any insinuation by Appellee that *Hoge II* limited or overruled the *Dunham* Rule by stating that "gas is a mineral." *Hoge II,* 468 A.2d at 1383. The *Hoge II* Court made this statement without discussing the *Dunham* Rule,

9. In light of *Gibson* and *Moore* being controlling jurisprudence in 1881 when the deed herein was executed, we have no difficulty in rejecting Appellees' averment that the *Dunham* Rule does not apply to this case simply because *Dunham* was decided in 1882. We further note that the deed considered in *Dunham* was executed in 1870.

and therefore we find no merit to any averment that *Hoge II sub silentio* abrogated the *Dunham* Rule.[10]

Concerning the *Hoge II* decision itself, the deed reservation at issue there concerned coal rights and the related right of ventilation of coalbed gas. This distinction between *Hoge II*, the *Dunham* line of cases, and the instant appeal is critical for several reasons. First, the right of ventilation would only apply to coalbed gas because of its extremely dangerous and volatile nature. Related thereto, coalbed gas was not commercially viable at the time the deed reservation in *Hoge II* was executed due to its explosive characteristics.[11] Second, the *Hoge II* Court inherently made a legal distinction between coalbed gas and natural gas, despite recognizing the chemical similarities between the two, by upholding the landowners' right to drill through the coal seam to obtain natural gas. *Id.* at 1384–85. To this end, Appellees in the appeal *sub judice* forward no argument that the Marcellus shale natural gas is different than natural gas commonly found in sand deposits. Indeed, Appellants and their *amici* explicitly note that Marcellus shale natural gas is merely natural gas that has become trapped within the Marcellus Shale, rather than rising to the more permeable sand formations below the surface.

Lastly, the *situs* of Marcellus shale natural gas and the methods needed and utilized to extract that gas do not support deviation from a *Dunham* analysis. While we recognize that hydrofracturing methods are employed to obtain both coalbed gas and Marcellus shale natural gas, the basis of the *Dunham* Rule lies in the common understanding of the substance itself, not the means used to bring those substances to the surface. *See Gibson*, 5 Watts at 41 ("nothing is thought by [minerals] to be such unless it be of a metallic nature, such as gold, silver,

10. Moreover, the *Hoge II* Court cited to the *Dunham* decision for a general pronouncement of the rules of deed and contract construction. Presumably, had this Court wished to overrule or limit the *Dunham* Rule, it would have not cited to the *Dunham* opinion for this proposition.

11. This is not to say that natural gas cannot be extremely dangerous and volatile. The critical point is how coalbed gas was commonly understood when the deeds in *Hoge* were executed.

iron, copper, lead, [etc.] . . .”).  We therefore find no merit in any contention that because Marcellus shale natural gas is contained within shale rock, regardless of whether shale rock is or is not be a mineral, such consequentially renders the natural gas therein a mineral.  *Cf. Hoge II*, 468 A.2d at 1383 (“such gas as is present in coal must necessarily belong to the owner of the coal”).  Accordingly, we find no reason to apply *Hoge II* to this appeal, and, thus, no need to remand this case for fact-finding.

## V.

Therefore, under the *Dunham* Rule, the trial court correctly concluded on the averments of record that Marcellus shale natural gas was not contemplated by the private deed reservation presented in this case.  Accordingly, we reverse the order of the Superior Court and reinstate the order of the Susquehanna County Court of Common Pleas sustaining Appellants’ preliminary objection.

Jurisdiction relinquished.

Justice ORIE MELVIN did not participate in the consideration or decision of this case.

Chief Justice CASTILLE, Justice SAYLOR and EAKIN, Justice TODD and Justice McCAFFERY join the opinion.

Justice SAYLOR files a concurring opinion.

### CONCURRING OPINION

Justice SAYLOR.

I join the majority opinion.

That said, I find the original, nineteenth-century rationale for the *Dunham* Rule to be cryptic, conclusory, and highly debatable.  *Cf. Murray v. Allard*, 100 Tenn. 100, 43 S.W. 355, 359 (1897) (applying the majority rule holding that petroleum is a mineral and criticizing this Court’s *Dunham* decision as contrary to the great weight of authority; “proceed[ing] upon false principles”;  and reflecting only an “assumed general

view of the bulk of mankind," unsupported by conventional sources such as "dictionaries and other similar authorities"). Nevertheless, since *Dunham* has effectively served to establish a governing rule of property law in Pennsylvania for over a century,[1] too many settled expectations rest upon it for the courts to upset it retroactively. Accordingly—while, at least in the abstract, Appellees make a good case for fairer rules tied more closely to the general intentions of parties to land-interest conveyances, and, elsewhere, the *Dunham* Rule is recognized to be a very strict and idiosyncratic one—I join the majority in determining that the rule should pertain in the present scenario.

Finally, I note that, in terms of modern conveyances, the parties certainly have the ability to negate the impact of the *Dunham* decision by making their intentions clear on the face of the written instrumentation. This lessens the need for this Court to consider fashioning a new, prospective rule.

---

1. In this regard, on account of *Dunham*'s shortcomings, I find the "rule of property law" denominator more accurate than a characterization of *Dunham* as a sustainable effort to assess the actual intentions of the parties to a conveyance. *Accord* 1A SUMMERS OIL AND GAS § 7:16 (3d ed.2012) (explaining that the Pennsylvania post-*Dunham* decisions have "adhered to that view, not so much because the court was sure that in its ordinary sense the term 'minerals' did not include oil and gas, but because the previous decision had become a rule of law on which land titles in that state were based").